**GLYPTAL INC., Plaintiff,**

v.

**ENGELHARD CORPORATION, Defendant.**

**Civ. A. No. 91–12406–C.**

United States District Court, D. Massachusetts.

Sept. 17, 1992.

T. Philip Leader, Dunn, Leader & Allen, Worcester, Mass., for plaintiff.

Paul B. Galvani, Howard J. Castleman, Ropes & Gray, Boston, Mass., Seth W. Brewster, Office of Senator George J. Mitchell, Washington, D.C., for defendant.

## MEMORANDUM

CAFFREY, Senior District Judge.

This is an action in which the plaintiff, Glyptal, Inc. ("Glyptal"), a manufacturer of paint, asserts claims for breach of warranty and unfair trade practices against the defendant, Engelhard Corporation ("Engelhard"), a supplier of chemical products. Engelhard has counterclaimed to collect payment for products it sold to Glyptal. The case is presently before the Court on a motion for summary judgment by Engelhard. Engelhard seeks summary judgment on each count in Glyptal's complaint and on its counterclaim. For the reasons stated below, Engelhard's motion for summary judgment on Glyptal's complaint should be granted in part and denied in part, and its motion for summary judgment on its counterclaim should be denied.

### I. FACTS

Except where otherwise noted, the following facts are not in dispute. In the first quarter of 1989, Glyptal received an order from General Electric Corporation ("GE"). The order was for the exterior paint for forty-two railroad locomotives. Glyptal needed a supply of pigment to give the paint the shade of yellow required by GE. Accordingly, in the first quarter of 1989, Maynard Winstead, Glyptal's manager of

product development and company chemist, met with Gail Shields, an Engelhard sales representative. Shields suggested that a pigment called cadmium 20 would fulfill the requirements.

Winstead then requested and received a small sample of cadmium 20 from Engelhard. He conducted various tests on a paint mixture that included as one of its ingredients the sample of cadmium 20 provided by Engelhard. Among the tests performed by Winstead was a test for viscosity. GE required the paint mixture to have a certain viscosity so that it would not become too thick to be applied through sprayers. Winstead concluded that the mixture containing the cadmium 20 satisfied GE's specifications, including its specification for viscosity.

Thereafter, Glyptal ordered two separate deliveries of cadmium 20 from Engelhard. These orders of cadmium 20 were to be incorporated into the actual, production batches of paint that were to be supplied to GE for use on the locomotives. Glyptal placed the first order on May 5, 1989, and the second order on May 12, 1989.

The order of May 5, 1989, was for 1600 pounds of cadmium 20. Glyptal received this shipment on May 11, 1989. The order of May 12, 1989 was for 600 pounds of cadmium 20, which Glyptal received on May 18, 1989. In addition to the actual shipment, Engelhard claims to have sent acknowledgment forms to Glyptal confirming each order. The order acknowledgment that Engelhard claims to have sent to Glyptal in response to the order of May 5, 1989, was dated May 6, 1989.[1] The order acknowledgment for the order of May 12, 1989, was dated May 15, 1989. The reverse side of each order acknowledgment form contained various terms and conditions of sale. Among these terms and conditions were provisions that disclaimed liability for most warranties as well as provisions that limited the remedies that would be available to the buyer in the event of a breach

by Engelhard. The warranty disclaimers provided as follows:

SELLER warrants that goods sold hereunder are merchantable UNLESS manufactured in conformance with BUYER'S specifications.... SELLER MAKES NO WARRANTY OF FITNESS FOR BUYER'S PARTICULAR PURPOSE, NOR ANY OTHER WARRANTIES EXPRESS OR IMPLIED. SELLER EXPRESSLY DISCLAIMS ALL ORAL WARRANTIES.... SELLER SPECIFICALLY, BUT NOT BY WAY OF LIMITATION, DOES NOT WARRANT THE ACCURACY OR SUFFICIENCY OF ANY ADVICE OR RECOMMENDATIONS GIVEN TO BUYER IN CONNECTION WITH THE SALE OF GOODS HEREUNDER.

The remedy-limiting provisions stated:

In the event of a breach of warranty by SELLER, SELLER at its option shall either (i) replace or repair the goods, (ii) refund the purchase price upon return of the goods, or (iii) grant a reasonable allowance on account of such breach.... THIS SHALL BE BUYER'S EXCLUSIVE REMEDY.... Neither SELLER nor BUYER shall be liable for any special, incidental, consequential, contingent, negligent or punitive damages resulting from breach of warranty, delay of performance or any other default hereunder.

After creating a paint mixture using the cadmium 20 supplied by Engelhard, and shipping the mixture to GE, Glyptal became aware that an unexpected chemical reaction was occurring, causing the viscosity of the mixture to increase too rapidly to be within GE's specifications. To investigate the viscosity problem, Glyptal employee Kamlesh Sheth telephoned Engelhard on June 2, 1989 and spoke with Mark Dilorenzo, one of Engelhard's technical service representatives. After Sheth explained the nature of the problem, Dilorenzo explained

---

1. Assuming Engelhard sent this order acknowledgment as it claims to have done, the date on the order acknowledgment, May 6, 1989, may not reflect the date on which it was actually sent. May 6, 1989 was a Saturday, and it appears that Engelhard's normal procedure was to send order acknowledgments on the first business day following receipt of the order. (Szipla Aff. ¶ 2). In this instance, the first business day would have been Monday, May 8, 1989.

that zinc-related impurities are sometimes present in cadmium 20, which can cause viscosity build-up. Sheth asked Dilorenzo if he could recommend a pigment that could substitute for cadmium 20 without causing the viscosity problem. Dilorenzo recommended a pigment called cadmium 1864.

On June 2, 1989, immediately after the telephone conversation between Sheth and Dilorenzo, Glyptal telephoned an order to Engelhard for 1600 pounds of cadmium 1864. Glyptal received this shipment on June 6, 1989. In addition, Engelhard sent an order acknowledgment form to Glyptal confirming the order of cadmium 1864. The date June 5, 1989 appeared on the face of this order acknowledgment, and its reverse side contained the same terms and conditions, including the warranty disclaimers and remedy-limiting provisions, that appeared on the earlier order acknowledgments.

As soon as Glyptal received the shipment of cadmium 1864 on June 6, 1989, it performed a test for viscosity on a paint mixture that substituted cadmium 1864 for the cadmium 20. However, because Glyptal was under pressure to deliver the paint to GE on time, Glyptal did not perform certain other tests on the new mixture that it otherwise might have performed. For example, Glyptal did not test the new mixture for weatherability or lightfastness. After the viscosity proved satisfactory, Glyptal created a full production batch of paint incorporating the cadmium 1864.

Thereafter, Glyptal shipped the paint containing the cadmium 1864 to GE, and GE applied the paint to the locomotives. The paint, however, proved to be unsatisfactory. In the fall of 1990, GE notified Glyptal that the yellow paint with the cadmium 1864 that was applied to the locomotives faded badly in less than one year. As a result, Glyptal had to bear the cost of repainting the locomotives.

Glyptal's complaint in the instant case arises from the three contracts—the orders of May 5, 1989 and May 12, 1989 for the purchase of cadmium 20, and the order of June 2, 1989 for the purchase of cadmium 1864—entered into by Glyptal and Engelhard. Glyptal's complaint has four distinct claims: a claim for breach of express warranties, a claim for breach of the implied warranty of merchantability, a claim for breach of the implied warranty of fitness for a particular purpose, and a claim for unfair trade practices under chapter 93A of the Massachusetts General Laws. Each of the four claims relates both to the cadmium 1864 contract as well as to the cadmium 20 contracts. In its counterclaim, Engelhard asserts that Glyptal never paid Engelhard for the goods delivered under the order of June 2, 1989 nor for goods delivered under a subsequent order.

## II.

### A. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A genuine issue of fact exists if the evidence is such that a reasonable finder of fact could find in favor of the nonmoving party. *Id.* In determining whether a genuine issue exists, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. at 2513.

### B. Terms of the Contracts

A natural starting point for the analysis of the instant case is to determine whether or not the warranty disclaimers and remedy-limiting provisions contained in Engelhard's order acknowledgments should be incorporated into the parties' contracts. The Uniform Commercial Code permits sellers of goods to disclaim liability for breaches of warranty. U.C.C. § 2–316. The seller also may limit the remedies available to the buyer by disclaiming liability for conse-

quential damages. U.C.C. § 2–719. However, in the absence of a provision validly disclaiming liability for warranties, contracts for the sale of goods contain an implied warranty of merchantability, U.C.C. § 2–314, and, in some circumstances, an implied warranty of fitness for a particular purpose. U.C.C. § 2–315. Similarly, absent a valid disclaimer for consequential damages, the buyer can recover such damages under certain circumstances. U.C.C. § 2–715.

In the instant case, Engelhard argues that the disclaimers in its order acknowledgments preclude liability on the basis of most warranties,[2] and that the remedy-limiting provisions in its order acknowledgments prevent Glyptal from obtaining consequential or incidental damages. Glyptal, on the other hand, argues that the Court should give no effect to the order acknowledgments' warranty disclaimers and remedy-limiting provisions. Glyptal argues that each of the three contracts was formed by Glyptal's purchase order, which constituted an offer, and the subsequent shipment of the goods by Engelhard, which Glyptal argues constituted an acceptance. Glyptal contends that, with respect to each of the three contracts to purchase pigment, it did not receive Engelhard's order acknowledgments until after Engelhard had shipped the goods. On that basis, Glyptal argues that Engelhard's acknowledgments constituted mere proposals for additional terms, which should not be incorporated into the parties' agreements under the Code's battle-of-the-forms provision, U.C.C. § 2–207.

▪ Before considering whether the disclaimers and remedy-limiting provisions in Engelhard's order acknowledgments should be incorporated into the parties' agreements, the Court must determine whether to apply Massachusetts law or Ohio law. Glyptal is a Massachusetts corporation. Engelhard received Glyptal's orders at its facility in Ohio and shipped the pigment from the Ohio plant. In cases based on diversity jurisdiction, a court must apply the forum state's choice-of-law principles. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Quaker State Oil Refining Corp. v. Garrity Oil Co.*, 884 F.2d 1510, 1514 (1st Cir.1989). In cases involving contracts for the sale of goods in which the parties have not agreed to apply the law of a particular state,[3] Massachusetts courts apply the " 'law of the state where under the terms of the contract the seller is to deliver the chattel unless, with respect to the particular issue, some other state has a more significant relationship' in light of general choice-of-law considerations." *Quaker State*, 884 F.2d at 1515 (citing *Travenol Lab., Inc. v. Zotal, Ltd.*, 394 Mass. 95, 99, 474 N.E.2d 1070 (1985)). In the instant case, Engelhard delivered the goods to Glyptal's address in Massachusetts, and nothing in the record suggests that Ohio has a more significant relationship to the transaction than Massachusetts. Thus, Massachusetts law should govern.

Massachusetts' version of the Uniform Commercial Code's battle-of-the-forms provision, U.C.C. § 2–207, states in relevant part:

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional or different terms are to be construed as proposals for addition to the contract. Between merchants

---

2. The order acknowledgments allowed for liability on the basis of an express warranty of merchantability.

3. The Court observes that one of the terms of Engelhard's order acknowledgement provided that Ohio law would govern the parties' contract. The Court declines, however, to take this provision into account in performing its choice-of-law determination. It would seem illogical to allow any aspect of the order acknowledgment form to influence the direction of the case without first choosing the law and performing the analysis that determine whether the order acknowledgements should be incorporated into, or excluded from, the parties' agreements.

such terms become part of the contract unless:

(a) the offer expressly limits acceptance to the terms of the offer;

(b) they materially alter it; or

(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

Mass.Gen.Laws Ann. ch. 106, § 2–207 (West Supp.1992).

■ Ordinarily, *Roto–Lith, Ltd. v. F.P. Bartlett & Co.*, 297 F.2d 497 (1st Cir.1962), controls the application of Mass.Gen.L. ch. 106, § 2–207 in this district. *See, e.g., Plymouth Rubber Co. v. Uniroyal, Inc.*, No. 89–175–WF, 1992 WL 93223, at *4 1992 U.S. Dist. LEXIS 5142, at *10 (D.Mass. Apr. 14, 1992). Under *Roto–Lith*, where a seller's acknowledgment materially alters the terms of the buyer's initial offer, the response is to be considered a counter-offer expressly conditioned on the buyer's assent to the additional terms. *See Roto–Lith*, 297 F.2d at 500; *Gilbert & Bennett Mfg. Co. v. Westinghouse Elec. Corp.*, 445 F.Supp. 537, 546 (D.Mass.1977). If the buyer then accepts "the goods with knowledge of the conditions specified in the acknowledgment," the buyer becomes bound by the terms of the acknowledgment. *Roto–Lith*, 297 F.2d at 500.

■ Glyptal, however, argues that *Roto–Lith* does not apply in the instant case because, unlike the buyer in *Roto–Lith*, Glyptal did not receive Engelhard's acknowledgment until after Glyptal received the goods.[4] The court in *Roto–Lith* expressly limited its holding to fact patterns in which the buyer receives the seller's acknowledgment no later than the goods. *Id.* at 459 n. 3. Moreover, no court in this Circuit has considered whether the holding in *Roto–Lith* extends to situations in which a seller's acknowledgment arrives later than the goods. And under an approach recommended by two frequently cited commentators, Professors White and Summers, the holding in *Roto–Lith* would not apply to such situations. Under their approach, a seller's acknowledgment that arrives after the seller ships the goods would not constitute a counter-offer or even an acceptance because, pursuant to section 2–206(1)(b) of the Uniform Commercial Code,[5] the shipment would constitute the seller's acceptance. 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 1–5 (3d ed. 1988 & Supp.1991). The acknowledgment would then be considered a mere proposal for additional terms, which either would be excluded from or incorporated into the parties' agreement depending upon the outcome of an analysis performed in accordance with section 2–207(2) of the Uniform Commercial Code.[6] *Id.*

4. Interpreting the facts in the light most favorable to Glyptal, the non-moving party, the Court finds that, with respect to each of the three shipments, there is a genuine issue of fact as to whether Glyptal received the shipment first, or whether it received the acknowledgment first. Thus, the Court assumes for purposes of this motion that Glyptal received the shipment first in each instance. The Court also notes that Glyptal contends that it never received Engelhard's acknowledgments for the first two shipments. However, for reasons that will become clear, this contention will have no bearing on the outcome of the instant motion for summary judgment. Therefore, the Court need not resolve at this point whether there is a genuine issue of fact regarding Glyptal's contention that it never received the first two order acknowledgments. Nevertheless, the Court observes that Engelhard submitted an affidavit by one of its employees detailing the company's standard procedure for creating and mailing order acknowledgments. (*See* Szpila Aff.) On the basis of this affidavit, Engelhard might be entitled to

a presumption that Glyptal received these acknowledgments. *See Roto–Lith*, 297 F.2d at 498 (holding that unrebutted presumption of receipt existed where defendant's evidence indicated that it prepared and mailed the acknowledgment, and plaintiff's witness testified that he did not know whether acknowledgment was received.)

5. U.C.C. § 2–206(1)(b) provides in relevant part: "an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or non-conforming goods." Mass.Gen.L. ch. 106, § 2–206(1)(b).

6. U.C.C. § 2–207(2) provides: The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) the offer expressly limits acceptance to the terms of the offer;

This Court is persuaded that it should follow the approach recommended by Professors White and Summers. Their approach is consistent with Comment two to section 2–207, which provides that "a proposed deal which in commercial understanding has in fact been closed is recognized as a contract. Therefore, any additional matter contained in the confirmation or in the acceptance falls within subsection (2) and must be regarded as a proposal for an added term...." Undoubtedly, the "commercial understanding" concerning a seller's shipment in response to a buyer's purchase order is that the parties have closed a deal. Once a deal is closed, Comment two indicates that section 2–207(2) controls the handling of any additional terms. In the instant case, then, the Court considers the contents of Engelhard's order acknowledgments to be additional terms, and the Court must apply section 2–207(2) to determine whether or not those additional terms should be incorporated into the parties' agreement.

■ On the facts of the instant case, the relevant clause within section 2–207(2) is clause (b). Under clause (b), additional terms that "materially alter" the contract are excluded from the parties' agreement. Mass.Gen.L. ch. 106, § 2–207(2)(b). The Court has found no cases applying section 2–207(2)(b) based on Massachusetts law. Thus, the Court will rely on case law from other jurisdictions to determine, first, whether Engelhard's remedy-limiting provisions materially altered the parties' contracts, and, second, whether Engelhard's warranty disclaimers materially altered the parties' contracts.

Although there had been some disagreement among courts as to whether remedy-limiting provisions materially alter a contract under section 2–207(2)(b),[7] the recent trend is to find that such provisions are material alterations. *Step–Saver Data Sys., Inc., v. Wyse Technology*, 939 F.2d 91, 105 (3rd Cir.1991); *Bergquist Co. v.*

*Sunroc Corp.*, 777 F.Supp. 1236, 1248 (E.D.Pa.1991); *Dale R. Horning Co. v. Falconer Glass Indus.*, 730 F.Supp. 962, 967 (S.D.Ind.1990). These recent cases point out that provisions that limit the remedies available to the buyer alter the distribution of risk among the parties, *Step–Saver*, 939 F.2d at 105 (holding that remedy limitations are material alterations as a matter of law), and can impose substantial economic hardship on the buyer. *Falconer Glass*, 730 F.Supp. at 967 (holding that limitation of consequential damages materially altered contract). This Court is persuaded that the recent trend represents a sound approach. Accordingly, this Court holds that the provisions in Engelhard's order acknowledgments that attempt to disclaim liability for consequential and incidental damages are material alterations. Those provisions, therefore, are excluded from the parties' agreements.

■ The case law concerning whether warranty disclaimers are material alterations is more uniform. Courts have held consistently that warranty disclaimers materially alter a contract under section 2–207(2)(b). *Step–Saver*, 939 F.2d at 105; *Trans–Aire Int'l, Inc. v. Northern Adhesive Co.*, 882 F.2d 1254, 1263 (7th Cir.1989) (noting that warranty disclaimers are regularly characterized as a material alteration under Illinois law); *Twin Disc, Inc. v. Big Bud Tractor, Inc.*, 772 F.2d 1329, 1334 (7th Cir.1985) (applying Wisconsin law); *Tuck Indus., Inc. v. Reichhold Chem., Inc.*, 151 A.D.2d 565, 542 N.Y.S.2d 701 (1989); *Southeastern Adhesives Co. v. Funder America, Inc.*, 89 N.C.App. 438, 366 S.E.2d 505, 507–08 (1988); *cf. Valtrol, Inc. v. General Connectors Corp.*, 884 F.2d 149, 155 (4th Cir.1989) (holding that warranties in buyer's purchase orders materially altered existing contract which had limited warranties); *Boese–Hilburn Co. v. Dean Machinery Co.*, 616 S.W.2d 520, 528 (Mo.App.Ct. 1981) (holding that inclusion of warranty clause where none previously existed and

(b) they materially alter it; or
(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

7. For a discussion of case law on both sides of the question, see *Dale R. Horning Co. v. Falconer Glass Indus.*, 730 F.Supp. 962, 965 (S.D.Ind. 1990).

was expressly disclaimed constitutes material alteration). In addition, Comment four to section 2–207 indicates that "a clause negating such standard warranties as that of merchantability or fitness for a particular purpose" is an example of an additional term that normally would materially alter the contract. Mass.Gen.L. ch. 106, § 2–207 Comment 4. Thus, this Court concludes that each of the three contracts between Glyptal and Engelhard exclude all those provisions in Engelhard's order acknowledgments that purported to disclaim or alter Engelhard's liability for breaches of warranty. Accordingly, those disclaimers have no bearing on whether Glyptal's claims for breach of express warranties, breach of the implied warranty of merchantability, and breach of the implied warranty of fitness for a particular purpose survive Engelhard's motion for summary judgment. Rather, the viability of those claims depends on the existence of genuine issues of material fact as to whether they satisfy the relevant provisions of the Uniform Commercial Code. The Court will discuss in turn each of the breach of warranty claims.

### C. Express Warranties

Section 2–313 of the Uniform Commercial Code controls the making of enforceable express warranties. It provides in relevant part:

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the sample or model.

Mass.Gen.L. ch. 106, § 2–313. Count I of Glyptal's complaint alleges that Engelhard breached express warranties regarding the two cadmium 20 contracts as well as the cadmium 1864 contract.

■ With respect to the cadmium 20 contracts, Glyptal contends that Engelhard created an express warranty under section 2–313(1)(c) by supplying samples of the product. Under section 2–313(1)(c), "[a]ny sample or model which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the sample or model." Mass.Gen.L. ch. 106, § 2–313(1)(c). Whether a sample "is made part of the basis of the bargain" is essentially a question of fact. See Mass. Gen.L. Ch. 106, § 2–313 Comment 6. According to deposition testimony of Maynard Winstead, Glyptal's manager of product development, Glyptal obtained a sample of cadmium 20 from an Engelhard sales representative in the Spring of 1989. (See Winstead Dep. at 50.) Glyptal then performed tests incorporating the sample cadmium 20 into its paint formulation. Id. at 50–53. Winstead testified that, as a result of these tests, the paint formulation incorporating the sample cadmium 20 met the required specifications for viscosity. Id. at 53–54. On that basis, a reasonable trier of fact could conclude that the sample cadmium 20 was made part of the basis of the bargain with respect to Glyptal's two orders for cadmium 20.

A reasonable trier of fact also could find that the cadmium 20 that Engelhard ultimately delivered under the two orders did not conform to the sample. Statements made by Engelhard employee Mark Dilorenzo indicated that cadmium 20 sometimes contained zinc impurities that could cause a paint mixture containing cadmium 20 to be too thick. (See Sheth dep. at 42.) In addition, an internal memorandum of Engelhard shows that Engelhard performed a test comparing the viscosity of the sample cadmium 20 versus the production cadmium 20 delivered to Glyptal under the contracts. (Dilorenzo Dep. Ex. 7.) The test revealed that the production cadmium 20 had a higher viscosity—in other words, was thicker—than the sample cadmium 20. Accordingly, a reasonable trier of fact could conclude that, under section 2–313(1)(c), En-

gelhard breached a warranty created by the sample cadmium 20. Thus, to the extent Engelhard seeks summary judgment on Count I with respect to Glyptal's claims regarding cadmium 20, the motion for summary judgment should be denied.

With respect to Glyptal's contention that Engelhard breached an express warranty regarding cadmium 1864, Glyptal relies principally on section 2–313(1)(a), which states in relevant part: "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." Mass.Gen.L. ch. 106, § 2–313(1)(a). Glyptal contends that Mark Dilorenzo, an Engelhard technical service representative, expressly warranted during a telephone conversation with Kamlesh Sheth, a Glyptal employee, that Cadmium 1864 would be a suitable substitute for cadmium 20.

That telephone conversation took place on June 2, 1989, when Sheth called Glyptal to investigate the viscosity problem that Glyptal was experiencing with cadmium 20. He was connected to Dilorenzo. After they discussed the viscosity problem, Sheth asked Dilorenzo whether he could recommend a substitute pigment for cadmium 20. Dilorenzo indicated that using cadmium 1864 instead of cadmium 20 might solve the viscosity problem. Later in the day on June 2, Engelhard placed an order for cadmium 1864. After receiving delivery, Glyptal formulated a new paint mixture using the cadmium 1864, and supplied the product to General Electric, which applied the paint to its locomotives. Thereafter, it became evident that the paint mixture containing the cadmium 1864 had inadequate light fastness qualities, which caused the paint to fade prematurely.

Engelhard argues that Dilorenzo's statements in his conversation with Sheth did not create any express warranty regarding the quality or suitability of the cadmium 1864, other than that the cadmium 1864

might solve the viscosity problem. Specifically, Engelhard contends that it made no representations concerning the light fastness qualities of cadmium 1864. Glyptal, on the other hand, points out that, during the June 2 telephone conversation, Dilorenzo had in front of him a brochure that contained information on cadmium 1864. (*See* Dilorenzo Dep. at 73.) Glyptal claims that the brochure recommended cadmium 1864 for use in plastic and rubber and not in paint. Furthermore, according to Sheth's deposition testimony, Sheth told Dilorenzo during their conversation that the mixture would be used as an exterior coating for locomotives. Thus, Glyptal contends that Dilorenzo's comments amounted to an affirmation that cadmium 1864 would be an appropriate pigment to use in an exterior paint, when, in fact, he knew or should have known that it would not be an appropriate pigment for such usage.

Glyptal also refers to two conversations that took place on June 5, 1989.[8] In the first conversation, Glyptal employee Maynard Winstead spoke with Dilorenzo. According to Winstead's affidavit, Winstead asked Dilorenzo whether cadmium 1864 was equal to cadmium 20 in terms of lightfastness. Dilorenzo responded that it was. (Winstead aff. ¶ 4.) In the second conversation, Winstead claims that he made a similar inquiry of another Engelhard employee, Howard Ruppender. Winstead claims that he told Ruppender that the cadmium 1864 would be part of a formulation intended for exterior use, and that the formulation would require "good exterior durability." *Id.* Winstead further claims that Ruppender responded that cadmium 1864 would be a good pigment for exterior durability. *Id.* Engelhard, on the other hand, claims that, during the conversation, Ruppender emphasized the importance of conducting tests using small samples of cadmium 1864 before producing a full-scale production batch of paint. Win-

8. Since Glyptal placed its order for cadmium 1864 on June 2, 1989, the contract arguably may have been formed by the time the telephone conversations took place on June 5, 1989. Ne-

vertheless, statements made after the formation of a contract can form the basis of an express warranty. *See* Comment 7 to Mass.Gen.L. ch. 106, § 2–313.

stead, however, denies that Ruppender recommended conducting tests.

■ Thus, there is a genuine issue of fact concerning the actual content of the conversation between Ruppender and Winstead. Furthermore, it appears that a reasonable fact finder could conclude that the statements by Ruppender and Dilorenzo amounted to affirmations that cadmium 1864 would have adequate lightfastness and would be suitable for use in an exterior paint. Accordingly, Engelhard is not entitled to summary judgment with respect to Count I.

### D. Implied Warranty of Merchantability

■ By virtue of section 2–314(1) of the Uniform Commercial Code, contracts for the sale of goods between merchants contain an implied warranty of merchantability. Mass.Gen.L. ch. 106, § 2–314(1). To be merchantable, goods must be "fit for the ordinary purpose for which such goods are used." *Id.* § 2–314(2)(c). In Count II of its complaint, Glyptal alleges that Engelhard breached the implied warranty of merchantability with respect to the cadmium 20 contracts as well as the cadmium 1864 contract.

A reasonable trier of fact easily could find that use as an ingredient in paint is an ordinary purpose for which cadmium 20 is used. And, as discussed previously, based on the evidence presently in the record, one could conclude that the cadmium 20 sold by Engelhard to Glyptal caused Glyptal's paint mixture to be too thick to be applied efficiently. Engelhard's tests that compared the sample cadmium 20 against the production cadmium 20 suggest that the cadmium 20, and not some other component in Glyptal's mixture, caused the thickness. On that basis, a reasonable trier of fact could conclude that the batches of cadmium 20 supplied to Glyptal were not fit to be used as an ingredient in a paint mixture, and that Engelhard therefore breached the implied warranty of merchantability in its contract to sell cadmium 20 to Glyptal.

■ Glyptal also contends that Engelhard breached the implied warranty of merchantability with respect to the cadmium 1864 contract. As mentioned previously, Engelhard intended cadmium 1864 for use in plastic and rubber, but not in paint. Therefore, it might appear that the warranty of merchantability does not apply to Glyptal's use of the cadmium 1864 because Glyptal used it in a manner inconsistent with its ordinary purpose. But section 2–314(2)(c) encompasses not only those uses which the seller intended, but also those uses which are reasonably foreseeable. *Back v. Wickes Corp.*, 375 Mass. 633, 640, 378 N.E.2d 964 (1978).

In view of the telephone conversations between Glyptal's employees and Engelhard's employees, a reasonable fact finder could conclude that Engelhard reasonably could have foreseen that Glyptal would use cadmium 1864 in an exterior paint. As mentioned previously, according to Sheth's deposition testimony, Sheth told Dilorenzo that Glyptal intended to use the cadmium 1864 in a mixture that would be used as an exterior coating for locomotives. Winstead claims in his affidavit that he told both Dilorenzo and Ruppender that the cadmium 1864 would be part of a formulation intended for exterior use, and that the formulation would require good exterior durability. And because the mixture containing the cadmium 1864 ultimately proved to have poor exterior durability, a reasonable fact finder could conclude that Engelhard breached the implied warranty of merchantability with respect to the cadmium 1864 contract. Accordingly, Engelhard is not entitled to summary judgment with respect to Count II of Glyptal's complaint.

### E. Implied Warranty of Fitness for a Particular Purpose

■ In Count III of Glyptal's complaint, Glyptal alleges that Engelhard breached an implied warranty of fitness for a particular purpose. Like the allegations in Counts I and II, Count III relates to the cadmium 20 contracts as well as the cadmium 1864 contract. Under Mass.Gen.L. ch. 106, § 2–315, a claim for breach of an implied warranty for a particular purpose requires proof of three factual elements. First, the seller must have reason to know of the particular purpose for which the

buyer requires the goods; second, the seller must have reason to know that the buyer is relying on the seller's skill or judgment in selecting or furnishing suitable goods; and third, the buyer in fact must rely upon the seller's skill or judgment. *Fernandes v. Union Bookbinding Co.*, 400 Mass. 27, 34, 507 N.E.2d 728 (1987).

Under these requirements, the cadmium 20 contracts contained no implied warranty of fitness for a particular purpose. Specifically, no reasonable fact finder could conclude that Glyptal has satisfied the second or third requirements. With respect to the second requirement, given that Glyptal obtained samples of cadmium 20 from Engelhard before placing the two production-quantity orders, Engelhard had no reason to believe that Glyptal was relying on Engelhard's skill or judgment. With respect to the third requirement, given that Glyptal performed its own tests on the samples, including tests for viscosity, Glyptal clearly did not rely on Engelhard's skill or judgment, but instead relied on its own conclusions. Accordingly, Engelhard is entitled to summary judgment with respect to those allegations in Count III that relate to cadmium 20.

Engelhard, however, is not entitled to summary judgment with respect to the allegations concerning cadmium 1864 in Count III. First, Sheth claims that he told Dilorenzo that the cadmium 1864 would be used as an ingredient in a paint mixture which would be used as an exterior covering for locomotives. (Sheth aff. ¶ 2; *see also* Dilorenzo dep. at 62.) Thus, a reasonable trier of fact could conclude that Engelhard had reason to know of the purpose for which Glyptal required the goods. Moreover, since Engelhard apparently envisioned that cadmium 1864 would be used in plastic and rubber but not in paint, Glyptal's use of the product can qualify as a "particular purpose" under section 2–315. *See Hannon v. Original Gunite Aquatech Pools, Inc.*, 385 Mass. 813, 821, 434 N.E.2d 611 (1982).

Second, a genuine issue of fact exists as to whether Engelhard had reason to know that Glyptal was relying on Engelhard's skill or judgment in selecting the goods. Engelhard contends that it had no reason to believe that Glyptal was relying on Engelhard's judgment because Engelhard employees Dilorenzo and Ruppender warned Glyptal's employees to conduct their own test on a sample of cadmium 1864 before using it in the actual production paint mixture. (Dilorenzo aff. ¶ 4; Ruppender aff. ex. A.) Glyptal's employees, however, deny having received such warnings from Dilorenzo and Ruppender. (Sheth aff. ¶ 2; Winstead aff. ¶ 5.) Interpreting these facts in the light most favorable to Glyptal, the Court assumes for the purposes of this motion that Engelhard's employees did not recommend to Glyptal that it perform its own tests. On that basis, a reasonable fact finder could conclude that Engelhard had reason to know that Glyptal was relying on Engelhard's judgment.

Third, a reasonable fact finder could conclude that Glyptal, in fact, relied on statements made by Dilorenzo and Ruppender concerning cadmium 1864. According to Sheth's affidavit and deposition testimony, Dilorenzo, knowing that Glyptal intended to use cadmium 1864 in an exterior paint mixture, suggested cadmium 1864 as a suitable substitute for cadmium 20. Moreover, according to Winstead's affidavit, both Dilorenzo and Ruppender said that cadmium 1864 would have satisfactory lightfastness and exterior durability characteristics. Following the conversations in which Dilorenzo and Ruppender made those statements, Glyptal, without performing its own test for lightfastness, included cadmium 1864 in a production batch of its paint mixture. Based on these facts, a reasonable fact finder could infer that Glyptal relied on the skill and knowledge of Engelhard's employees' in deciding to use cadmium 1864. Thus, with respect to the cadmium 1864 contract, Glyptal has demonstrated the existence of genuine issues of material fact regarding each of the three requirements for maintaining a claim for breach of the implied warranty of fitness for a particular purpose. Accordingly, Engelhard is not entitled to summary judg-

ment with respect to those allegations in Count III that relate to cadmium 1864.[9]

### F. Unfair Trade Practices—Chapter 93A

 In Count V of its complaint, Glyptal claims that Engelhard's conduct in connection with the three contracts for the purchase and sale of pigment constituted unfair and deceptive trade practices prohibited by Chapter 93A of the Massachusetts General Laws. Breaches of express and implied warranties constitute a virtual per se violation of Mass. Gen.L. ch. 93A, § 2. *E.g., Maillet v. ATF–Davidson Co.* 407 Mass. 185, 193, 552 N.E.2d 95 (1990). Accordingly, because Glyptal's breach of warranty claims have, for the most part, survived Engelhard's motion for summary judgment, Glyptal's chapter 93A claim should survive as well. Thus, Engelhard should not be entitled to summary judgment with respect to Count V.

### G. Engelhard's Counterclaim

 Engelhard's counterclaim is based on the assertion that Glyptal has not paid Engelhard for two shipments of pigment. One of those shipments included the cadmium 1864 that, together with the cadmium 20 that Glyptal claims to have been defective, is the subject of Glyptal's complaint. Glyptal has demonstrated the existence of genuine issues of material fact as to whether Engelhard breached warranties concerning the cadmium 1864. Accordingly, there are genuine issues of material fact as to whether Engelhard should be paid for the cadmium 1864.

Engelhard also seeks payment for other shipments of pigment that are not involved in Glyptal's claims. Glyptal, however, contends that the amount it owes Engelhard for these other shipments would be more than offset by the amount it claims to be owed from Engelhard for the cadmium 20. Glyptal paid Engelhard for the cadmium 20, and, because it asserts that the cadmium 20 was defective, Glyptal claims that Engelhard should return that payment.

There are genuine issues of material fact as to whether and to what extent Glyptal can offset the amount it owes to Engelhard for these other shipments. Thus, Engelhard should not be entitled to summary judgment on its counterclaim.

For all of the reasons stated above, Engelhard's motion for summary judgment on Glyptal's complaint should be granted in part and denied in part, and its motion for summary judgment on its counterclaim should be denied.

Order accordingly.

---

**9.** Count IV of Glyptal's complaint is a claim for breach of contract. Count IV appears to be based on Glyptal's claims for breaches of express and implied warranties asserted in Counts I through III. Accordingly, since Engelhard is not entitled to summary judgment with respect to the warranty claims, it is likewise not entitled to summary judgment with respect to Count IV.