DALE R. HORNING CO., INC., d/b/a
Architectural Glass & Metal
Co., Plaintiff,

v.

FALCONER GLASS INDUSTRIES,
INC., Defendant.

No. IP88–502–C.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Jan. 25, 1990.

Bill Kennedy and Heather McPherson, Kothe Claycombe Kortepeter & McPherson, Indianapolis, Ind., for plaintiff.

Gerald A. Wunsch and Cynthia Wodock, White & Raub, Indianapolis, Ind., for defendant.

## ORDER ON BENCH TRIAL

McKINNEY, District Judge.

This cause comes before the Court after a two day bench trial on the merits on December 18–19, 1989. The plaintiff's complaint seeks recovery of consequential damages for breach of warranty under the Uniform Commercial Code. After hearing the evidence and reviewing the law, the Court now makes the following findings of fact and conclusions of law.

### I. *Findings of Fact:*

Plaintiff Architectural Glass & Metal Company ("AGM") is an Indiana corporation engaged in the business of installing and glazing commercial glass products. During the summer of 1986, AGM was a subcontractor on the Finance Federal Credit Union construction project in Indianapolis. AGM was to install a curtain wall and other glass in the building, and time was of the essence for AGM because the building could not be completely enclosed until AGM was finished. Pursuant to its subcontract agreement, AGM would incur daily penalties of $150.00 and possibly be terminated as the glazing subcontractor if it did not meet deadlines. AGM was to be substantially finished with its work by October 3, 1986.

On August 4, 1986, Greg Menefee, then president of AGM, telephoned defendant Falconer Glass, a New York corporation. AGM ordered a quantity of ¼ inch Spandrel, a ceramic-backed glass product. The Spandrel was to be used at AGM's credit union job site. The parties agreed by phone that the product would be delivered by Falconer within three to four weeks of being ordered. There was no discussion of limiting remedies or disclaiming warranties over the phone. Based on Falconer's experience in the industry and the context of AGM's order, Falconer knew or had reason to know of the buyer's general or particular requirements at the time of contracting.

The next day, AGM sent Falconer a confirming order form. This document contained no language regarding warranties or damages, and noted in handwriting that shipment was to be on an "as needed" basis. At the same time, Falconer sent off its form to subcontractor AGM. The front side of Falconer's form indicated that it confirmed "verbal 8/4/86," that the product was due in "3rd Qtr.1986," and that manufacturing time would be four weeks.

Falconer's standard form contained fine print on the reverse side, with 16 separate paragraphs under the heading "General Terms and Conditions of Sale." Paragraph 7 recited that the product would be free from defects. Paragraph 8, however added that the buyer's "exclusive and sole remedy" for defective goods "shall be to secure replacement...." It also added that the seller shall not be liable for "special, direct, indirect, incidental or consequential damages...." This language was in the same small print as the rest of the terms, and was not underlined, bold-faced, or set forth in capital letters.

Later on in the month of August, AGM provided Falconer with the precise dimensions for the Spandrel panels. On September 23, 1986, defendant Falconer delivered a shipment of defective Spandrel to AGM. Upon timely inspection AGM determined that some of the glass was defective. AGM notified Falconer, and attempted to correct the defects per Falconer's instructions. Gregory Hass, then an officer of AGM, contacted Falconer and informed them that AGM was going to temporarily install the glass to enclose the structure by the deadline date. If the first shipment had been satisfactory, AGM would have completed the project on time and without extra cost. Falconer's first shipment to AGM was timely under the contract as it was made within four weeks of the date the specifications were given to Falconer.

Hass told Carlo Carmen, Falconer's manufacturing manager, that Falconer would be liable for AGM's extra costs, and Car-

men did not object. Hass presumed that Carmen had the authority to bind Falconer, and Hass believed that Falconer would pay AGM's extra costs stemming from the defective glass. AGM then temporarily installed the Spandrel in order to keep the construction project on schedule and to avoid incurring other costs such as heating expenses. Approximately 37 replacement panels were then shipped on September 29, 1986.

Carmen came to Indianapolis at some point to inspect the glass. Hass picked Carmen up at the airport and the drove to the job site. Hass mentioned the extra charges that would be incurred, and indicated to Carmen that AGM would hold Falconer responsible. Carmen did not object or otherwise respond in any fashion.

Later, AGM's manager, Greg Menefee, stated to Carl Defenderfer, Falconer's midwestern sales representative, that AGM expected Falconer to pay for the extra costs incurred by AGM because of the defects in the product. Defenderfer agreed that Falconer should be responsible but said "take it easy on us."

Through late 1986 and early 1987, several corrective shipments were sent by Falconer to AGM, and on several occasions AGM had to remove defective glass and install new product in its place. During this time, AGM paid for the preparation and installation of the defective glass, the preparation of the replacement product, the removal of the defective glass, and the permanent installation of the replacement glass. AGM eventually invoiced Falconer for the charges relating to the Spandrel installation less the expenses and charges that would have been incurred had the original shipment been satisfactory. AGM's invoice was in the sum of $19,415.67.

No agent or employee of AGM was aware of the restrictive terms and conditions on the back of Falconer's forms, although AGM representatives did know that Falconer and other suppliers placed terms and conditions on the back of their forms. AGM was not expressly aware of the limitation on consequential damages contained on the confirmation form sent by Falconer in this transaction.

In the commercial glass industry, it is common practice for suppliers to place restrictive warranty terms on the back of their forms. Despite such standard terms, suppliers will often work with the buyer to help cover some or all of the extra costs incurred when the product is defective. On several occasions, Greg Menefee has been involved in projects where Falconer or other glass suppliers have paid for extras due to defects in their products. Commercial glass subcontractors are routinely subject to additional costs if their own work is unsatisfactory or untimely.

## II. *Discussion:*

As this Court discussed at length in an earlier opinion, a key issue in this case is whether Falconer's limitation of consequential damages contained on its standard form is a term of the parties' contract under the Code. Resolution of this issue is a question of fact that depends upon the evidence in the case as applied to several key provisions of the Code.[1]

The starting point must be § 2–715 of the Code, which provides that consequential damages may be recovered by the buyer for "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." The drafters of § 2–715 commented that there need not be a "conscious acceptance of an insurer's liability on the seller's part, nor is his obligation for consequential damages limited to cases in which he fails to use due effort in good faith." *Uniform Commercial Code Comment to § 2–715.* Thus, "Any seller who does not wish to take the risk of consequential damages has available the [S]ection [2–719] on contractual limitation of remedy." *Id.*

In this case, then, because there was no specific agreement reached as to consequential damages on August 4, 1986, and

---

**1.** The Court incorporates its discussion of this issue as set forth in the "Order on Motion to Dismiss," dated April 11, 1989. *See* 710 F.Supp. 693.

because Falconer knew or had reason to know of AGM's general or particular requirements at that time and such extra costs could not be avoided by cover or otherwise, the initial premise must be that, as of August 4, 1986, AGM could recover consequential damages under § 2–715 of the Code.

On August 5, 1986, however, Falconer dispatched one of its standard forms to AGM and attempted to exclude consequential damages per its fine print on the reverse of the document. This raises the question of whether these terms become a part of the parties agreement by operation of law under § 2–207.

### A. *Battle of the forms under § 2–207:*

■ As set forth in this Court's previous opinion, the central issue in this case is whether these additional or different terms become part of the parties' contract. Section 2–207(2) provides that where, as here, both parties are merchants, such terms become part of the contract unless they materially alter the prior agreement. The standard for resolving this question is well settled. An additional term is said to materially alter a contract "if its incorporation into the contract without express awareness by the other party would result in surprise or hardship." *Maxon Corp. v. Tyler Pipe Industries, Inc.,* 497 N.E.2d 570, 576 (Ind.App.1986); *accord,* Greenberg, *Rights and Remedies Under U.C.C. Article 2,* at 75 (1987); Annot., *What Are Additional Terms Materially Altering Contract Within Meaning of UCC § 2–207(b),* 72 A.L.R.3d 479, 483 (1976).

As this Court ruled at the summary judgment stage, the case law makes it clear that the seller's attempt to limit the implied warranty of merchantability operates to materially alter the prior agreement as a matter of law. *See Official Comment 4 to § 2–207; Twin Disc, Inc. v. Big Bud Tractor,* 772 F.2d 1329, 1334 (7th Cir.1985). The case law on consequential damages, however, is not in total agreement.

On the one hand, the Wisconsin Supreme Court has held that an attempt to limit consequential damages materially alters a contract because consequential damages are ordinarily available under § 2–715. *Air Products and Chemicals, Inc. v. Fairbanks Morse, Inc.,* 58 Wis.2d 193, 206 N.W.2d 414, 424 (1973). Other courts have reached similar conclusions. *See, e.g., Transamerica Oil Corp. v. Lynes, Inc.,* 723 F.2d 758, 765 (10th Cir.1983) ("A limitation of remedy generally constitutes a material alteration"); *Westinghouse Electric Corp. v. Nielsons, Inc.,* 647 F.Supp. 896, 900 (D.Colo.1986) (limitation of seller's liability for incidental and consequential damages is a material alteration); *Album Graphics, Inc. v. Beatrice Foods Co.,* 87 Ill.App.3d 338, 42 Ill.Dec. 332, 339, 408 N.E.2d 1041, 1048 (1980) ("A term disclaiming warranties, and we might add a term limiting remedies, is undoubtedly a term that materially alters a contract.").

On the other hand, in *Kathenes v. Quick Chek Food Stores,* 596 F.Supp. 713 (D.N.J. 1984), the court ruled that a clause limiting consequential damages would not materially alter a contract and was thus binding on both parties. The *Kathenes* court relied heavily on the fact that Official Comment 5 to § 2–207 states that a clause limiting a remedy in a reasonable manner is not a material alteration. 596 F.Supp. at 716. The court wrote, "The comment cross-references Section 2–719 on the modification and limitation of remedies." *Id.* "Thus, [a seller's] terms limiting [a buyer's] remedies would be a part of the contract as long as it is reasonable under Section 2–719." *Id.*

While this Court recognizes that Official Comment 5 does, in fact, make reference to § 2–719, the Court does not find that it necessarily follows that any limitation of consequential damages does not "materially alter" the parties' contract (§ 2–207 language) just because the limitation would be "reasonable." (§ 2–719). The statutory language of § 2–207 speaking to material alteration focuses on two elements: surprise or hardship. The fact that a clause may be reasonable under the remedy provision of § 2–719 does not dictate the outcome of the contract formation analysis under § 2–207. The ultimate question remains whether such a limitation would sur-

prise or work a hardship on the buyer; the issue of reasonableness is properly viewed as just one aspect of this material alteration analysis.

The Seventh Circuit Court of Appeals recently confirmed that the material alteration analysis involves the two separate components of surprise or hardship. In *Trans–Aire International, Inc. v. Northern Adhesive Co., Inc.*, 882 F.2d 1254 (7th Cir.1989), the Seventh Circuit held that an indemnification clause included in the fine print of a standard form constitutes a material alteration, notwithstanding the fact that some course of dealing existed between the parties. In so holding, the court emphasized that Comment 4 to Section 2–207 defines a material alteration as one which would " 'result in surprise *or hardship* if incorporated without the express awareness' of the nonassenting party." *Trans–Aire Int'l.*, 882 F.2d at 1261 (emphasis added by Seventh Circuit). The Seventh Circuit went on to explain that the surprise and hardship inquiries are separate and distinct analyses. In this case, then, this Court must evaluate both elements independently.

Here, the surprise element simply asks whether the new term would catch the buyer unaware. Course of dealing and usage of trade analysis is properly invoked at this stage, for if the buyer is generally aware that such limitations are imposed in the industry, the buyer cannot be heard to complain of surprise in any individual transaction. The evidence in this case is conflicting on this issue.

For instance, the seller's witnesses, all of whom have extensive experience in the commercial glass industry, testified that suppliers include such restrictive terms and conditions in their standard forms. The buyer's witnesses, on the other hand, stated that while they know standard forms have fine print on the reverse side, they do not know what those conditions are and do not read such forms. Suppliers such as Falconer, they added, often cover extras incurred due to defective products. Moreover, according to AGM's witnesses, the subcontractors are in constant fear of incurring additional costs for delays or defects in their own work.

Thus, the commercial glass industry appears to present a dichotomy in the course of dealing analysis. Suppliers work under the general understanding that replacement is the only remedy for them as against their own suppliers, and that in most cases replacement is their only liability when their own product is defective. Suppliers do, however, seem to make exceptions where it is in their best interest. Subcontractors, on the other hand, live in a world where every subcontractor is responsible to the next for its own delays and mishaps.

■ With this evidence, the question is whether AGM has proven that the disclaimer of consequential damages was a surprise.[2] On balance, this is a close factual question. On the one hand, there is no evidence that AGM subjectively knew of the limitations. There appears, however, to also be an objective element to this inquiry asking whether the buyer should have known that such conditions are included in standard forms. This objective aspect to the surprise inquiry is apparent from the context of § 2–207, which in essence supplies a presumption that the additional terms contained in confirmation forms are not read by the opposing party.

Applying this mixed subjective-objective standard, the Court finds that even though the subcontractor expects accountability as among other subcontractors, it should anticipate and even expect suppliers to attempt to exclude consequential damages. Falconer and most other commercial glass manufacturers routinely attempt to limit

**2.** The burden of showing surprise appears to be on the nonassenting buyer here, for § 2–207 states that between merchants, such terms become a part of the contract unless they materially alter it. In this case, then, if the buyer presented no evidence on surprise, the Code would add the presumption that the term is a part of the agreement. The buyer thus bears the burden of proof on this matter, for as the Seventh Circuit has noted in an unrelated context, "[T]he party who would lose if no evidence were presented has the burden [of proof]." *Auburndale State Bank v. Dairy Farm Leasing Corp.*, 890 F.2d 888, 893 (7th Cir.1989).

their liability for such damages, and even though their methods are less than perfect, it appears that no commercial glass subcontractor can be heard to claim surprise given the course of dealing and usage of trade in the industry. Thus, AGM has not shown that the restrictive terms of Falconer's confirmation form materially alter their agreement under the surprise aspect of § 2–207.

As the Seventh Circuit made clear in *Trans–Aire International*, however, this does not end the inquiry, for the question of hardship remains. Hardship, of course, is defined as something "hard, oppressive, toilsome, [or] distressing." *Webster Encyclopedic Dictionary*. In the sale of goods setting, this analysis necessarily focuses on whether a limitation of consequential damages would impose "substantial economic hardship" on the nonassenting party. *Trans–Aire Int'l.*, 882 F.2d at 1262. In this situation, where Falconer knew or had reason to know that AGM could incur substantial liability for delays in finishing its subcontract, there can be no doubt that a limitation of consequential damages would work a hardship on the buyer.

It must be remembered that where, as here, the seller knew or had reason to know of the buyer's general or particular requirements, Section 2–719 of the Code supplies the presumption that consequential damages are recoverable. Thus, the starting premise again is that because the parties did not specifically agree to exclude consequentials, AGM could recover them. AGM thus had the Code's implied protection of substantial economic rights.

Falconer's attempt to limit AGM's right to these damages must fail because it would work a hardship on AGM. As the Seventh Circuit explained in *Trans–Aire International*, "Clearly, a shift in legal liability which has the effect of relieving one party of the potential for significant economic hardship and placing this burden upon another party is an important term in any contract." *Id.* at 1263. "Thus, it is not surprising that such a term, if it is to be included in a contract, is ordinarily the subject of active negotiation between the parties." *Id.* "We therefore do not believe that a party charged with legal duties and obligations may reasonably rely upon a boilerplate clause in a boilerplate form and a corresponding operation of law to shift substantial economic burdens from itself to a nonassenting party when it had every opportunity to negotiate such a term if it desired." *Id.*

This reasoning is equally applicable here, and is supported by additional case law cited previously for the proposition that a limitation of consequential damages is a material alteration under the Code. *See, e.g., Transamerica Oil Corp. v. Lynes, Inc.*, 723 F.2d 758, 765 (10th Cir.1983) ("A limitation of remedy generally constitutes a material alteration"); *Westinghouse Electric Corp. v. Nielsons, Inc.*, 647 F.Supp. 896, 900 (D.Colo.1986) (limitation of seller's liability for incidental and consequential damages is a material alteration); *Album Graphics, Inc. v. Beatrice Foods Co.*, 87 Ill.App.3d 338, 42 Ill.Dec. 332, 339, 408 N.E.2d 1041, 1048 (1980) ("A term disclaiming warranties, and we might add a term limiting remedies, is undoubtedly a term that materially alters a contract.").

AGM faced thousands of dollars in potential liability for consequential damages if its supplier's product was defective and caused delays. Falconer knew or had reason to know of this because of its experience in the industry and the context of the sale. When the oral agreement was consumated on August 4, 1986, AGM had the legal right under the Code to obtain consequential damages from the supplier. Falconer attempted to shift this substantial economic burden back to AGM not through negotiation, but instead by inserting fine print boilerplate on the reverse side of a confirming standard form.

Under the Code, such a shift in liability would impose hardship on AGM. Accordingly, the purported limitation of consequential damages would materially alter the parties original agreement, and is thus not a part of their contract under Section 2–207.[3] AGM has thus proven that it is entitled to recover consequential damages caused by Falconer's defective product.

---

**3.** If the Court were to reach a contrary finding on this matter, there would remain other issues

As the Code makes clear, it is no consolidation to Falconer in this sale of goods setting that it acted in good faith and made every effort to replace the glass as quickly as possible. Falconer agreed to supply a quality product in a short period of time in an industry in which defective products can cause construction delays and corresponding extra costs. Falconer did not meet its contractual obligations, and under the Code it is liable for all consequential damages proximately resulting from its breach.

## B. *Damages:*

■■■ The buyer has the burden of proof to show the amount of consequential damages sustained. *Official Comment 4 to § 2-715; Bob Anderson Pontiac, Inc. v. Davidson,* 155 Ind.App. 395, 293 N.E.2d 232, 237 (1973). However, the Code does not require mathematical precision, and the loss may be shown in any manner reasonable under the circumstances. *Official Comment 4 to § 2-715; Bob Anderson Pontiac,* 293 N.E.2d at 237. The trier of fact must be able to estimate the damages with a reasonable degree of certainty and exactness. *Uebelhack Equipment, Inc. v. Garrett Bros., Inc.,* 408 N.E.2d 136, 140 (Ind.App.1980).

■■■ In this case, the proof of damages presented by the parties is conflicting. AGM's calculations result in a figure of $19,145.67, while Falconer's produce a value of $6,730.00. Both parties' evidence has probative value on the measure of damages, and the Court is not constrained to accept one side's figures over the other's. Instead, in this case, the Court finds it appropriate to make its own estimation of damages using the evidence presented by both parties on each aspect of damages. For the reasons set forth in the accompanying footnote, the Court awards total damages of $12,303.17 to the plaintiff.[4]

## C. *Prejudgment Interest:*

Finally, plaintiff seeks to recover prejudgment interest, arguing that such an award is appropriate under *Ind.Code*

---

to address before it could be concluded that Falconer is not liable for consequentials. First, the issue of procedural unconscionability would be analyzed. In *Maxon Corp. v. Tyler Pipe Industries, Inc.,* 497 N.E.2d 570, 577–78 (Ind.App. 1986), the Indiana Court of Appeals held that the *insertion of an indemnification clause not agreed to by the parties* amounted to procedural unconscionability where the clause appeared in one sentence at the end of a long passage in boilerplate. The *Maxon* court reasoned that procedural unconscionability can exist even where there is no disparity in bargaining power. The court added, "Imposing such a clause upon a disadvantaged party who knows not what he signs and guilefully imposing it upon a party through the unilateral use of an invoice at or after the time the product is delivered represents a distinction without a material difference." *Id.* at 578. In this case, the Court need not reach this issue, but merely points out that it would need to be addressed if a different conclusion were reached on the 2–207 issue.

Another issue that would require consideration is whether Falconer's agents bound their principal for *extra charges subsequent to the discovery of the problem.* Falconer's post-trial brief on this question indicates that AGM would likely lose on this issue if it were reached.

4. There appear to be several different elements of damages in this case, including materials, labor costs, and overhead. As to materials, the plaintiff introduced evidence that it had to incur expenses of $3,149.44 in materials because of the defective Spandrel, including the rental of equipment or purchase of backing and materials. These expenses are accurate, except as to invoice B–965 for rental of a scissor lift.

The documentary evidence shows that invoice B–965 in the amount of $1,575 was later credited in the amount of $866.25 on invoice BC–47. Thus, the figures for materials shown by the plaintiff on Exhibit M must be adjusted. The net result is that the expense incurred for invoice B–965 equals $708.75 rather than $1,251.59. The total materials expense is thus $2,506.60 plus 5% tax, for a total of $2,631.93.

The second element of damages here is labor costs. Plaintiff made its calculations with the figure of $13.00 per hour, while defendant's expert testified that $10.25 is the prevailing wage. The Court finds the average of $11.62 per hour to be an appropriate figure for damages here. Plaintiff apparently figured 633.28 hours to be the total number of hours expended due to replacement efforts, while defendant's expert testified that the job could have been corrected in 250 man hours. Again, the Court finds the average of these to be a reasonable figure and uses the figure of 441.64 hours. This yields a total labor cost of $5,220.18. Taxes and insurance on this figure are reasonably figured at 21%, for an additional $1,096.24, thus yielding a total labor cost of $6316.42.

The next figure of damages is overhead for the hours reasonably expended by the plaintiff in replacing the defective product. Plaintiff proffered the figure of $14.26 per hour, and there is no evidence rebutting this. The Court finds plaintiff's figure reasonable and adopts it accordingly. Using this rate and the 441.64 hours yields an overhead cost of $6,297.79.

§ 24–4.6–1–103. Defendant has not responded to this aspect of plaintiff's claim. For the reasons set forth below, the Court denies the request for prejudgment interest.

In diversity actions, federal courts must look to state law to determine the propriety of awarding prejudgment interest. *Travelers Ins. Co. v. Transport Ins. Co.*, 846 F.2d 1048, 1051 (7th Cir.1988). In Indiana, prejudgment interest is available when damages are ascertainable in accordance with fixed rules of evidence and accepted standards of valuation at the time damages accrue, but is not appropriate when the trier of fact must use its best judgment to assess the amount of damages. *Simmons, Inc. v. Pinkerton's, Inc.*, 762 F.2d 591, 607 (7th Cir.1985); *accord, Indiana Industries, Inc. v. Wedge Products, Inc.*, 430 N.E.2d 419, 427 (Ind.App. 1982); *Nering v. Stockstill*, 448 N.E.2d 695, 697 (Ind.App.1983).

The underlying purpose of awarding prejudgment interest on compensatory damages is to make the wronged party whole by compensating that party for being deprived of the money prior to judgment. *Travelers Ins. Co. v. Transport Ins. Co.*, 846 F.2d 1048, 1052 (7th Cir.1988). The goal is not to award "interest," but instead to accomplish full compensation. *Id.*

In this case, the Court finds that prejudgment interest is not a proper element of damages. First, there has been no "account stated" as alleged by plaintiff in its brief so as to bring into play the statutory language of *Ind. Code* § 24–4.6–1–1–103.[5] An account stated is defined as an agreement between the parties that all items of account are correct, together with a promise to pay. *Urbanational Developers, Inc. v. Shamrock Engineering, Inc.*, 175 Ind.App. 416, 372 N.E.2d 742, 750 (1978). There certainly was no agreement in this case that the invoice sent by AGM was correct, nor was there a promise to pay from Falconer. The plaintiff cannot find its remedy in this theory.

Second, the Court finds that the items of consequential damage in this case required the trier of fact to exercise judgment and were not all amenable to calculation by ascertainable standards. For instance, the overhead calculation invoked judgment as to the proper value of that item of damages. Thus, all of the damages in this particular case are not proper subjects for prejudgment interest.

Finally, although there is some disagreement on the issue, the Court notes that equitable awards of prejudgment interest that are not based on the mandatory language of a specific statute appear to lie within the Court's discretion. *See City of Anderson v. Salling Concrete Corp.*, 411 N.E.2d 728, 735 (Ind.App.1980); *Crook v. Shearson Loeb Rhoades, Inc.*, 591 F.Supp. 40, 51 (N.D.Ind.1983) (involving federal and state claims); *but see Erie–Haven, Inc. v. Tippmann Refrigeration Const.*, 486 N.E.2d 646, 650–51 (Ind.App.1985) (noting that prejudgment interest "is not generally considered a matter of discretion," without distinguishing between equitable and statutory awards) In this case where plaintiff's request is grounded in equity rather than a mandatory statute, the Court in its discretion determines that the goals of full and just compensation have been met and that an award of prejudgment interest is not appropriate as an equitable remedy.

### D. *Conclusion:*

In sum, the parties' failure to fully discuss the terms of their contract at the time

---

The final figure is the profit that AGM could have earned on this sum of all costs of $15,246.17. Plaintiff assumed a 5% figure without refutation from the defendant, and the Court finds this to be reasonable. This profit rate yields an additional sum of $762.31, for a grand total of $16,008.48.

From this figure the Court must set-off the $3,705.12 in unpaid Falconer invoices. Net total damages thus equal $12,303.17. This is the amount of consequential damages to which

AGM is entitled for Falconer's breach of contract. Such items of labor, overhead, and lost profit are properly awarded as consequential damages in this type of case. *See, e.g., Draft Systems, Inc. v. Rimar Mfg., Inc.*, 524 F.Supp. 1049, 1053–56 (E.D.Pa.1981).

**5.** This statutory provision states that interest at the rate of 8% shall be allowed "from the date an itemized bill shall have been rendered and payment demanded on an account stated...."

of agreement has resulted in numerous hours of legal work, several lengthy opinions from this Court, a two-day trial on the merits, and a judgment for $12,303.17. The lesson to be learned from this case is that merely inserting boilerplate provisions into standard forms is not the end-all way to deal with the U.C.C. Such post-agreement action, it is seen once again today, is not always enough to force one party's desires upon the other.

Despite the Code's rejection of the mirror-image rule, it is apparent that the best, and, in some instances, the only way to get a preferable term into a contract *is to actually propose the term and reach a meeting of the minds* on the issue. The Code did not completely abolish the concept of mutual assent. In this setting, for instance, if suppliers such as Falconer want to exclude consequential damages from all their contracts, they can simply adopt and enforce a policy that all sales representatives must inform the prospective buyer at the time of bidding that such damages will not be recoverable. On the other hand, if buyers such as AGM want to ensure that they can recover such extras without complex litigation, they can demand such provisions in all agreements. In both instances, counsel planning such action for the client would need to have an eye towards, among other things, the admissibility requirements for regularly recorded business records.

This case also shows once again that a call to an attorney for preventive advice is often more cost-effective than the call made months or years later after the situation has become impenetrable and stubbornness has taken root. It also demonstrates that attorneys called upon to render such planning advice should probably do more than just draft fine print boilerplate. Today's decision shows that the U.C.C. requires more in this particular setting anyway.

As the Indiana Court of Appeals noted in the related area of indemnification more than a decade ago, "Lawyers who specialize in this field are well aware that clauses such as those under consideration in this case demand laborious judicial parsing, in an effort to distill the intent of the par-

ties." *Indiana State Highway Commission v. Thomas,* 169 Ind.App. 13, 346 N.E.2d 252, 263 (1976) *quoting Jordan v. City of New York,* 3 A.D.2d 507, 162 N.Y. S.2d 145, 152 (1957). The *Thomas* court added, "Surely, at this stage, it is not too much to require them to stop waging verbal warfare and to state unmistakably whether or not a contract purports to burden the indemnitor with another's negligence." *Id.*

So, too, in this context, it is not too much to require something more than "form warfare." The Code requires more than burying a party's preferred terms in boilerplate. Contrary to popular belief, § 2–207 does not always condone nor justify the battle of the forms. In fact, as this case shows, the Code often requires the parties to actually agree to their preferred contractual terms.

Judgment for the plaintiff shall be entered accordingly. Pursuant to Rule 54(d), costs shall be allowed to the plaintiff as a prevailing party.

IT IS SO ORDERED.