**In re CHATEAUGAY CORPORATION, Reomar, Inc., The LTV Corporation, et al., Debtors.**

**LTV ENERGY PRODUCTS COMPANY, Plaintiff,**

v.

**NORTHERN STATES CONTRACTING COMPANY, INC., Defendant.**

Bankruptcy Nos. 86–B–11270 (BRL) to 86–B–11334 (BRL), 86–B–11402 (BRL), 86–B–11464 (BRL) and 86–B–11307 (BRL). Adv. No. 93–8317A.

United States Bankruptcy Court, S.D. New York.

Jan. 21, 1994.

Seward & Kissel, New York City, for LTV Energy Products Company; M. William Munno, Peter C. Mester, of counsel.

Eugene C. Tenney, Buffalo, NY, for Northern States Contracting Company, Inc.; Laura C. Doolittle, of counsel.

## MEMORANDUM AND DECISION ON MOTION FOR SUMMARY JUDGMENT

STUART M. BERNSTEIN, Bankruptcy Judge.

The Plaintiff and Debtor, LTV Energy Products Company ("LTV"), commenced this adversary proceeding to recover $22,517.60 from the Defendant Northern States Contracting Company, Inc. ("Northern"), and to expunge Northern's claim in the amount of $1,727,240.65. LTV's claim against Northern represents the unpaid purchase price for certain bridge bearing pads that LTV sold to Northern. Northern's claim against LTV represents the damages it claims it suffered because LTV delivered some of the pads over one year late.

LTV has moved for summary judgment to recover the purchase price and expunge Northern's claim. For the reasons set forth below, LTV's motion is granted to the extent of expunging so much of Northern's claim that seeks consequential, delay or labor-related damages, and is otherwise denied.

## FACTS

At all relevant times, LTV was engaged in the business, *inter alia*, of manufacturing materials used in the construction of bridges. At the time in question, Northern was competing for a construction contract with the New York State Department of Transportation ("NYSDOT") to construct a bridge in upstate New York. Toward that end, and on or about February 23, 1984, Northern sent LTV's representative, Beeco Products, a purchase order for 140 Plain Bearing Pads at a cost of $3,617.60, and 140 Steel Laminated Pads at a cost of $18,900.00. The order was contingent upon the award of the construction contract to Northern by NYSDOT. The Northern Purchase Order called for delivery "ASAP", but did not contain any general terms or conditions of sale.

Oil States Rubber Co., a division of LTV, sent a Sales Order Acknowledgement (the "Acknowledgement") to Northern on or about March 5, 1984. The Acknowledgement, on the reverse side, contained LTV's Conditions of Sale and Trade Customs (the "LTV Conditions"), a pre-printed form consisting of eleven separate paragraphs. As might be expected, the LTV Conditions contained broad exculpatory language designed to protect LTV from the normal perils of contract damages. Paragraphs 2 and 4 of the LTV Conditions, which go to the heart of the issues in this case, disclaimed implied warranties, exculpated LTV from delay, labor-related or consequential damages, and limited Northern's remedies to repair or replacement of, or credit for, defective goods at the option of LTV:

2. . . . Seller does not guarantee to ship within the time promised, but uses its best efforts to do so, and shall not be liable for any damage caused by delay in delivery. . . .

. . . .

4. Seller warrants goods of its own manufacture against defects in materials and workmanship only, for a period of one year from the date of purchase, to the extent that it will repair or replace such goods f.o.b. point of manufacture, or allow credit therefor, at its election, when such goods are in the hands of the original purchaser, and used in normal use and service. Other goods are warranted only to the extent of the express warranty of the manufacturer thereof and to the extent such is enforceable by Seller. NO WARRANTY EITHER EXPRESS OR IMPLIED IS MADE BY SELLER AS TO THE FITNESS, MERCHANTABILITY, CONDITION, CAPACITY OR EFFICIENCY OF ANY GOODS SOLD and no claims for labor or for consequential damage will be allowed. SELLER'S LIABILITY IS LIMITED AS ABOVE SET FORTH

AND THE REMEDY HEREIN PRO-VIDED FOR THE BUYER, IS EXCLU-SIVE OF ALL OTHERS.

The Acknowledgement stated that LTV would ship the bearing pads eight to ten weeks after approval of the shop drawings. On or about March 6, 1984, LTV submitted its shop drawings to NYSDOT, and on or about March 12, 1984, NYSDOT approved them. On March 14, 1984, NYSDOT award-ed the contract to Northern at an approxi-mate price of $9 million.

In July 1984, LTV shipped the Laminated Bearing Pads to Northern without further problem or delay, but did not ship the Plain Bearing Pads until a year later. The initial NYSDOT testing of the Plain Bearing Pads in July 1984 revealed excessive compression deflection and surface cracking. After the original rejection of the Plain Bearing Pads in July 1984, representatives of LTV met with NYSDOT officials in August 1984, and engaged in extensive and in-depth discus-sions about the types of pads which the job required, why the pads had failed the testing, and how the problem could be resolved.

After this meeting, LTV took steps to change the design to ensure NYSDOT accep-tance. In November 1984, LTV resubmitted its revised pads for testing. The revised pads were again rejected in December 1984 and January 1985 on account of excessive compression deflection. Following these re-jections, Northern, at LTV's request, asked NYSDOT for permission to substitute a dif-ferent type of pad, but the request was turned down on February 19, 1985, as was a request to provide the rejected pads at a decreased price on March 15, 1985.

The February 19, 1985 letter is significant in another respect. According to an Amend-ed Claim (No. 76466–A) dated January 30, 1990, and filed by Northern against the State of New York in the Court of Claims, the NYSDOT contract called for Plain Bearing Pads to be manufactured in accordance with Standard Specification § 716.02, while the Laminated Bearing Pads were to be manu-factured in accordance with Standard Specifi-cation § 716.04.

When NYSDOT tested the Plain Bearing Pads, however, it apparently tested them to Specification § 716.04 (the test for steel lami-nated pads) rather than § 716.02 as per the contract with Northern. In its February 19, 1985, letter, NYSDOT advised Northern, for the first time, that "[t]he Plain Neoprene Bearings shall be supplied in accordance with the Material Specifications 716.04". It ap-pears, therefore, that LTV was manufactur-ing the Plain Bearing Pads to meet the con-tract specification (716.02), but NYSDOT was testing and rejecting them because they failed to meet a different specification (716.-04). The delay in completing the construc-tion project, and the damages that flowed to Northern from that delay, may be unrelated to anything LTV did or did not do; indeed, there is a serious factual question regarding whether LTV breached its agreement with Northern.[1]

Once NYSDOT clarified the specification, events moved more rapidly although not en-tirely without delay. On or about March 21, 1985, LTV submitted new shop drawings to NYSDOT, but NYSDOT returned them with-in a few days because they were not submit-ted in conformity with the requirements of Section 716.04. LTV resubmitted the draw-ings on or about April 1, 1985, and these drawings were accepted by NYSDOT. After additional alleged design and manufacturing delays, the Plain Bearing Pads were deliv-ered to Northern on or about July 19, 1985. Northern accepted this delivery as it did the earlier Laminated Bearing Pad delivery in July, 1984, but has never paid for either.

## DISCUSSION

LTV claims that it is entitled to summary judgment expunging Northern's claim for

---

1. LTV makes much of Northern's lawsuit against the State of New York in which it claims that NYSDOT was responsible for the same damages that it claims were caused by LTV. While the allegations in Northern's claim may be evidentia-ry admissions, they do not necessarily bar recov-ery. As Northern notes, it could only sue the State of New York—and only the State of New York—in the Court of Claims. Further, had it been able to sue the State of New York and LTV in the same forum, it could have asserted these same alternative claims, based on inconsistent theories, in a single lawsuit. We cannot see why the limited jurisdictions of the Court of Claims and this Court should work some sort of judicial estoppel against Northern.

consequential, delay and labor-related damages because the LTV Conditions became part of the parties' contract pursuant to Sections 2–207 and 2–719 of the Uniform Commercial Code (the "UCC") as adopted in New York[2]. In addition, because Northern received the bearing pads it ordered and it did not reject the goods as either defective or untimely, LTV seeks to recover the purchase price which Northern has never paid. Northern, on the other hand, contends that it suffered substantial consequential and delay damages due to LTV's year long delay in delivering the Plain Bearing Pads, and is entitled to assert that claim against the estate.

## A. The "Battle of the Forms"

■ This case is a classic illustration of the "battle of the forms": two merchants exchanged two sets of forms that contained additional or different terms, ignored them, and fully or substantially performed their agreement. A dispute then breaks out, and the parties, or more likely their lawyers "haul out their forms and read them—perhaps for the first time—and they will find that their forms diverge. Is there a contract? If so, what are its terms?" 1 J. White & R. Summers, Uniform Commercial Code § 1–3, at 28–29 (3d ed. 1988) ("White & Summers").

The answer lies in the Uniform Commercial Code which we summarize in part and quote at length. The Northern purchase order constituted an offer which LTV could accept by actual shipment or by a promise to ship. UCC § 2–206(1)(b). LTV did not ship, but instead, sent its Acknowledgement. To determine if the Acknowledgement was an acceptance giving rise to a contract, we are directed to UCC § 2–207, which provides:

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) the offer expressly limits acceptance to the terms of the offer;

(b) they materially alter it; or

(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act.

Under § 2–207(1), a contract was formed when LTV sent its Acknowledgement and the sole contingency (NYSDOT awarding the contract to Northern) took place. The Northern purchase order did not make acceptance expressly conditional on its assent to any additional or different terms raised by LTV, and further, both parties concede that a contract existed. Consequently, the remaining question is what were its terms.

As a starting point, Article 2 provides the missing terms. For example, as a mer-

---

2. The parties' Agreement does not contain a choice of law provision, and the parties do not mention the issue. Nevertheless, it appears that New York law governs the rights of the parties. A New York federal district court, sitting in diversity, must apply New York choice of law rules. *See Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). New York courts should apply the law of New York to commercial transactions which take place largely within its

boundaries. *Israel Discount Bank, Ltd. v. Rosen*, 59 N.Y.2d 428, 432 n. 1, 465 N.Y.S.2d 885, 887 n. 1, 452 N.E.2d 1213, 1215 n. 1 (1983). LTV delivered goods to New York for a New York highway construction project and the damages in this case are alleged to have taken place in New York. Consequently, the New York UCC is the governing law of the parties' agreement, and bears a "reasonable relationship" to the transaction involved. *See* UCC § 1–105, Official Uniform Comment No. 1.

chant [3], LTV made certain implied warranties which it could disclaim provided it followed certain procedures. See UCC § 2–316. In addition, UCC § 2–715(2)(a) entitles an aggrieved buyer to recover consequential damages resulting from general or particularized needs (1) which the seller knew of at the time of contracting and (2) could not be prevented by cover. We assume, for the purposes of argument, that a substantial portion of Northern's claim fits this criteria, and that *absent a contrary agreement,* Northern could recover consequential damages against LTV.

## B. Material Alterations

 If LTV and Northern reached a contrary agreement concerning the recoverability of consequential (as well as delay and labor-related) damages, i.e., Northern is bound by the limitation on liability clauses in the Acknowledgement, it can only occur as a result of the effect of UCC § 2–207. As LTV and Northern are both merchants, Section 2–207(2) provides that the additional terms [4] in the LTV Acknowledgement became part of the contract unless the offer limited acceptance to the terms of the offer (which Northern's purchase order did not), Northern objected to the additional terms within a reasonable time (which it did not), or the additional terms "materially alter" the contact, which Northern claims they do. In resolving this issue, we must ignore the temptation to conclude that if parties are litigating over a term, it is most likely to be a "material alteration", 1 White & Summers, § 1–3, at 40, and consider the phrase in light of the meaning that the UCC gives to it.

 A term "materially alters" a contract if it "result[s] in surprise and hardship if incorporated without express awareness by the other party." UCC 2–207, Official Uniform Comment, No. 4.[5] Such terms include clauses negating the warranties of merchantability and fitness for a particular purpose. *Id.* Conversely, Official Uniform Comment No. 5 provides examples of clauses which do not "materially alter" a contract:

Examples of clauses which involve no element of unreasonable surprise and which therefore are to be incorporated in the contract unless notice of objection is seasonably given are: ... a clause limiting the right of rejection for defects which fall within the customary trade tolerances for acceptance "with adjustment" or otherwise limiting remedy in a reasonable manner (see Sections 2–718 and 2–719).

UCC § 2–719, to which this Official Uniform Comment refers, deals with limitations on remedies and on consequential damages. It provides as follows:

(1) Subject to the provisions of subsection (2) and (3) of this section and of the preceding section on liquidation and limitation of damages,

(a) the agreement may provide for remedies in addition to or in substitution for those provided in this Article and may limit or alter the measure of damages recoverable under this Article, *as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts;* and

(b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

(2) Where circumstances cause an exclusive or limited remedy to fail of its essen-

---

3. A "merchant" is one who deals in goods of the kind or has or to whom one can attribute the "knowledge or skill particular to the practices or goods involved in the transaction." UCC § 2–104(1).

4. Although § 2–207(2)(b) speaks only of "additional" terms, the provision also applies to "different" terms. *Westinghouse Electric Corp. v. Nielsons, Inc.,* 647 F.Supp. 896, 900 n. 3 (D.Colo. 1986); *Air Products & Chemicals, Inc. v. Fairbanks Morse, Inc.,* 58 Wis.2d 193, 206 N.W.2d

414, 423 (1973); UCC § 2–207, Official Uniform Comment No. 3 ("Whether or not additional or different terms will become part of the agreement depends upon the provisions of Subsection (2)").

5. Official Uniform Comments do not have the force of law, but are nonetheless the most useful of several aids to interpretation and construction of the Uniform Commercial Code. 1 White & Summers § 4, at 12.

tial purpose, remedy may be had as provided in this Act.

(3) *Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable.* Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

Emphasis added.

The literal provisions of the UCC appear to provide a straightforward basis for analyzing the inclusion of a remedy or damage limitation clause in a battle of the forms between merchants. Section 2–207, Official Uniform Comment No. 5 renders such clauses reasonable, and directs the parties and the court to § 2–719. Under the latter provision, limitations on remedies, including consequential damages, are reasonable as a *matter of law,* and do not materially alter the parties' agreement, unless the limitation on the remedy, such as to repair or replacement, fails of its essential purpose, or the limitation on consequential damages is unconscionable. *See, e.g., Kathenes v. Quick Chek Food Stores,* 596 F.Supp. 713 (D.N.J.1984); *Hydraform Products Corp. v. American Steel & Aluminum Corp.,* 127 N.H. 187, 498 A.2d 339 (1985) (Souter, J.); *J.A. Maurer, Inc. v. Singer Co.,* 1970 WL 12645, 7 U.C.C.Rep. Serv. 110 (Sup.Ct.N.Y.Co.1970). This approach looks to § 2–719 rather than § 2–207 for the result in the case.

Many courts, however, do not follow this approach in assessing remedy and damage limitations. Even in actions involving merchants, they generally ignore the examples in UCC § 2–207, Official Uniform Comment No. 5, and instead concentrate their analysis on the "surprise and hardship" factors in Official Uniform Comment No. 4. Using this approach, they never reach § 2–719, instead holding as a *matter of law* that *any* limitation on the right to recover consequential damages is a material alteration, and hence, does not become part of the parties' agreement, because the limitation causes a significant and substantial shift in the ordinary allocation of risk. *See, e.g., Altronics of Bethlehem, Inc. v. Repco, Inc.,* 957 F.2d 1102, 1107–

08 (3d Cir.1992); *Winter Panel Corp. v. Reichhold Chemicals, Inc.,* 823 F.Supp. 963, 971 (D.Mass.1993); *Glyptal Inc. v. Engelhard Corp.,* 801 F.Supp. 887, 894 (D.Mass. 1992); *Reliance Steel Products Co. v. Kentucky Electric Steel Co.,* 1983 WL 160585, 35 U.C.C.Rep.Serv. 1430, 1433 (E.D.Pa.1983); *Album Graphics, Inc. v. Beatrice Foods, Co.,* 87 Ill.App.3d 338, 347, 42 Ill.Dec. 332, 339, 408 N.E.2d 1041, 1048 (1st Dist.1980); *Air Products & Chemicals, Inc. v. Fairbanks Morse, Inc.,* 58 Wis.2d 193, 206 N.W.2d 414, 424–25 (1973).

Other courts reject either *per se* approach. They analyze the question of material alteration on a case-by-case basis as purely a factual one. *See, e.g., Transamerica Oil Corp. v. Lynes, Inc.,* 723 F.2d 758, 765 (10th Cir.1983); *Dale R. Horning Co. v. Falconer Glass Industries, Inc. ("Horning I"),* 710 F.Supp. 693, 701 (S.D.Ind.1989); *Wheaton Glass Co. v. Pharmex, Inc.,* 548 F.Supp. 1242, 1245 (D.N.J.1982); *Cf. Hatzlachh Supply, Inc. v. Moishe's Electronics, Inc.,* 828 F.Supp. 178, 183 (S.D.N.Y.1993) (arbitration clause). Under this approach, the law presumes that between merchants, the remedy or damage limitation is not material; the party opposing its inclusion bears the burden of proving either surprise or hardship. *Comark Merchandising, Inc. v. Highland Group, Inc.,* 932 F.2d 1196, 1201 (7th Cir. 1991); *Bergquist Co. v. Sunroc Corp.,* 777 F.Supp. 1236, 1245 n. 11 (E.D.Pa.1991); *Dale R. Horning Co. v. Falconer Glass Industries, Inc. ("Horning II"),* 730 F.Supp. 962, 966 n. 2 (S.D.Ind.1990). This third approach, which we follow, recognizes that "a per se rule is absolutely contrary to the UCC's special emphasis on the particular circumstances surrounding each contractual relationship", *Bergquist Corp. v. Sunroc Corp.,* 777 F.Supp. at 1245, and there may be circumstances in which a remedy or damage limitation does not become part of the parties' agreement because of surprise or hardship.

## C. Surprise and Hardship

Under this third approach, the party opposing the limitation must show "surprise or hardship", two words the UCC leaves undefined. "Surprise" means that

"[a]n alteration is material if consent to it cannot be presumed." *Union Carbide Corp. v. Oscar Mayer Foods Corp.*, 947 F.2d 1333, 1336 (7th Cir.1991) (Posner, J.). It consists of both a subjective and objective element; what did the assenting party know and what should it have known. *See American Insurance Co. v. El Paso Pipe & Supply Co.*, 978 F.2d 1185, 1191 (10th Cir.1992); *Horning II*, 730 F.Supp. at 966–67. Factors bearing on this issue include the parties' prior course of dealing and the number of written confirmations that they exchanged, industry custom and the conspicuousness of the term. *American Insurance Co. v. El Paso Pipe & Supply Co.*, 978 F.2d at 1191; *see Comark Merchandising, Inc. v. Highland Group, Inc.*, 932 F.2d at 1202.

The analysis of "hardship" is more problematical. "Hardship" has been interpreted as "substantial economic hardship". *Trans–Aire Int'l Inc. v. Northern Adhesive Co.*, 882 F.2d 1254, 1262 (7th Cir.1989); *accord Bergquist Co. v. Sunroc Corp.*, 777 F.Supp. at 1246; *Horning II*, 730 F.Supp. at 967, and involves "a shift in legal liability which has the effect of relieving one party of the potential for significant economic hardship". *Trans–Aire Int'l*, 882 F.2d at 1263; *accord Bergquist Co. v. Sunroc Corp.*, 777 F.Supp. at 1246; *Horning II*, 730 F.Supp. at 967. Where a buyer faces substantial potential liability for consequential damages if the seller delays delivery or delivers a defective product, and the seller knew or had reason to know it, the seller's attempt to "shift this substantial economic burden back to [the buyer] not through negotiation, but instead by inserting fine print boilerplate on the reverse side of a confirming standard form" imposes hardship. *Horning II*, 730 F.Supp. at 967.

The problem caused by this definition of "hardship" is that it creates an exception that swallows up the rule. It prevents a limitation on consequential damages from ever becoming part of the contract under § 2–207(2)(b) because the limitation on consequential damages will always shift legal liability and place the "potential for significant economic hardship" on the other party. If the only way to avoid this result is through negotiation rather than boilerplate, UCC § 2–207 is rendered meaningless.

In part for this reason, the hardship analysis was criticized by Judge Posner in *Union Carbide Corp. v. Oscar Mayer Foods Corp.*, 947 F.2d 1333, 1336 (7th Cir.1991). The case involved a clause requiring indemnification rather than one limiting consequential damages, but it is nonetheless persuasive. The Seventh Court of Appeals criticized its earlier *Trans–Aire International* hardship analysis which, as noted above, had been followed or relied upon in subsequent cases [6]:

> Not infrequently the test is said to be "surprise or hardship," e.g., *Trans–Aire International, Inc. v. Northern Adhesive Co.*, 882 F.2d 1254, 1260–61 (7th Cir.1989); 1 Farnsworth, supra, s 3.21, at p. 266, but this appears to be a misreading of Official Uniform Comment 4 to UCC § 2–207. The comment offers examples of "typical clauses which would normally 'materially alter' the contract and so result in surprise or hardship if incorporated without express awareness by the other party" (emphasis added). *Hardship is a consequence, not a criterion.* (Surprise can be either.) *Schulze & Burch Biscuit Co. v. Tree Top, Inc., supra*, 831 F.2d [709,] at 714 [ (7th Cir.1987) ]. *You cannot walk away from a contract that you can fairly be deemed to have agreed to, merely because performance turns out to be a hardship for you, unless you can squeeze yourself into the impossibility defense or some related doctrine of excuse. Market Street Associates Limited Partnership v. Frey*, 941 F.2d 588, 594 (7th Cir.1991).

947 F.2d at 1335.[7] (Emphasis added).

The rule we cull from the case law is the following: Between merchants, where UCC

---

6. *See, e.g., American Insurance Co. v. El Paso Pipe & Supply Co.*, 978 F.2d at 1191–92; *Bergquist Co. v. Sunroc Corp.*, 777 F.Supp. 1236 (E.D.Pa.1991); *Horning II*, 730 F.Supp. 962 (S.D.Ind.1990).

7. Judge Posner's decision in *Union Carbide* appears to contradict his earlier decision in *Western Industries, Inc. v. Newcor Canada, Ltd.*, 739 F.2d 1198, 1205 (7th Cir.1984), in which the Court said that "attempts to change remedy terms, such as that which allows consequential dam-

§ 2–207(2)(a) and (2)(c) do not apply, the limitations on remedies or damages become part of the parties' agreement[8], unless the non-assenting party proves that (1) its inclusion constitutes unreasonable surprise in light of the parties' prior dealings, industry custom or inconspicuousness of the term, (2) the clause is unconscionable or (3) the limitation fails of its essential purpose.

Northern has failed to come forward with any evidence regarding surprise. Indeed, its factual submission is remarkably silent on this issue, and instead merely alleges that LTV breached its contract with Northern, Northern suffered substantial damages and the terms of the contract present factual issues that cannot be resolved on a motion for summary judgment. See Affidavit of Donald Barillari in Opposition to LTV Energy's Motion to Disallow and Expunge Claim No. 16173 of Northern States and for Summary Judgment on its Counterclaim against Northern States, sworn to September 24, 1993, at ¶¶ 21–23. Nor does this proof state whether there is a custom or practice in the industry which would bear on the surprise issue, or whether these parties previously dealt with each other, and have exchanged confirmations in past transactions.

Northern cannot create a factual issue simply by saying one exists. Its proof fails to allege—much less show—that it was unaware of the LTV Conditions at the time that the contract was formed, or that it was surprised by these conditions. Consequently, we can determine as a matter of law, that Northern has failed to show that a factual issue exists regarding surprise, and the limitations on remedies and consequential damages, therefore, became part of the parties' agreement unless the limitation on remedies failed of its essential purpose, or the limitations on consequential, delay and labor-related damages were unconscionable.

## D. Failure of Essential Purpose

▬ Under UCC Section 2–719(1)(a), an agreement may limit a buyer's remedy (e.g., repair and replacement), and the limitation will be enforceable unless, as provided in UCC Section 2–719(2), the exclusive or limited remedy fails "of its essential purpose". In that event, the buyer may avail itself of its UCC remedies. The underlying rationale is that parties to a contract must accept that "there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract," and hence, "where a fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of [Article 2 of the UCC]". UCC § 2–719, Official Uniform Comment No. 1. Where the buyer has accepted the goods, its general damage remedy is the difference between the value of the goods at the time and place of acceptance and the value as warranted, UCC Section 2–714(2), and incidental and consequential damages, if appropriate. UCC § 2–715.

▬ The exclusive or limited remedy of repair or replacement fails of its essential purpose if the seller does not effect repairs or replace the defective goods. 1 White & Summer § 12–10, at 602. The aggrieved buyer need not show that the seller was wilfully dilatory or even negligent as the damage is the same whether or not the seller acted in good faith. *Cayuga Harvester Inc. v. Allis–Chalmers Corp.,* 95 A.D.2d 5, 11, 465 N.Y.S.2d 606, 611 (4th Dept.1983) (Hancock, J.). Ordinarily, the failure of a remedy presents a question of fact. *Id.; see Belfont Sales v. Gruen Industries, Inc.,* 112 A.D.2d 96, 98–99, 491 N.Y.S.2d 652, 654–55 (1st Dept.1985).

---

ages", are material. In *Horning I,* 710 F.Supp. at 700 n. 8, the District Court observed that this language was dicta, and that the Official Uniform Comment that the *Western Industries* cited—Official Uniform Comment No. 6—did not support the proposition.

**8.** This conclusion does not apply to the warranty disclaimer. Warranty disclaimers are universal-

ly viewed as material alterations under UCC Section 2–207(2)(b), and do not become part of the parties' contract. *See, e.g., Glyptal Inc. v. Engelhard Corp.,* 801 F.Supp. 887, 894–95 (D.Mass. 1992) (and cases cited therein); *Tuck Industries Inc. v. Reichhold Chemicals, Inc.,* 151 A.D.2d 566, 567, 542 N.Y.S.2d 676, 678 (2d Dept.1989).

Paragraph 4 of the agreement between Northern and LTV limited Northern's remedy, for one year, to repair or replacement of the goods f.o.b. point of manufacture, or credit, at LTV's election. The failure or non-failure of this exclusive and limited remedy cannot be decided as a matter of law; factual issues preclude summary judgment. First, it is not clear that LTV ever breached its contract. There is evidence that the delay in delivery resulted because NYSDOT made a mistake or unilaterally changed its specification for the Plain Bearing Pads. Second, even if LTV breached its agreement, it eventually replaced the "defective" Plain Bearing Pads with ones that were approved by NYSDOT and accepted by Northern. Thus, the repair and replacement remedy appears to have served its intended purpose. Moreover, if NYSDOT contributed to the delayed "repair", it makes it more likely that LTV effected the remedy within a reasonable time.

On the other hand, time may have been so essential in LTV's fulfillment of its contract obligations that a repair delayed for one year was a repair denied. The original Northern purchase order required delivery ASAP; the LTV Acknowledgment promised delivery within eight to ten weeks following NYSDOT approval of the shop drawings. In a construction project like this, endless delays in effecting repair or replacement may become so costly that they deprive Northern of the "substantial value of its bargain". Thus, the remedy may be effective only if it is executed within a reasonable time. As noted, this cannot be determined without first deciding who—as between LTV and NYSDOT—was responsible for the delay. Moreover, the limited remedy "trapped" Northern because LTV controlled it, and Northern could not purchase the pads from an alternate source without continuing to face liability to LTV should it eventually repair or replace the Plain Bearing Pads.

### E. Unconscionability and the Limitation on Damages

 Although factual issues preclude summary judgment on whether the limited remedy failed of its essential purpose, it does not necessarily follow that factual issues prevent determination of the enforceability of the damage limitation clauses. If the consequential and other damage limitations are not unconscionable, they can still be enforced if they are independent of the limitation on remedies.

Section 2–719(3) of the UCC provides, in substance, that consequential damages may be limited or excluded unless it would be unconscionable to do so. The LTV Conditions include two provisions that limit damage remedies: paragraph two exculpates LTV from liability for delay damages, and paragraph four relieves LTV of liability for labor and consequential damages. Delay damages appear to be "incidental" rather than "consequential", UCC § 2–715(1); *Carbontek Trading Co. v. Phibro Energy Inc.*, 910 F.2d 302, 307–08 (5th Cir.1990) (applying New York law), although *Horning II* treats them as consequential damages. *Horning II*, 730 F.Supp. at 967. Labor expenses, depending on what they encompass, might arguably be either.

This distinction, however, is not important for our purposes. Although UCC § 2–719(3), by its terms, applies only to consequential damages, courts have also applied the unconscionability standard to limitations on incidental damages. *See, e.g., Colonial Life Insurance Co. of America v. Electronic Data Systems Corp.*, 817 F.Supp. 235, 240 (D.N.H. 1993); *Xerox Corp. v. Hawkes*, 124 N.H. 610, 475 A.2d 7, 10 (1984); *Schurtz v. BMW of North America, Inc.*, 814 P.2d 1108, 1115 (Sup.Ct.Utah 1991). We will, therefore, apply the unconscionability standard to all of the clauses that limit damages.

 The doctrine of unconscionability, which is governed by UCC § 2–302, interdicts one-sided contracts; it seeks to prevent "oppression and unfair surprise", but does not disturb the "allocation of risks because of superior bargaining power." UCC § 2–302, Official Uniform Comment No. 1; *accord State v. Avco Financial Service of New York, Inc.*, 50 N.Y.2d 383, 389, 429 N.Y.S.2d 181, 185, 406 N.E.2d 1075, 1078 (1980). It requires the party invoking the doctrine to show both an absence of meaningful choice in the contract formation process *and* contract terms unreasonably favoring the other party,

i.e., procedural and substantive unconscionability. *Fleischmann Distilling Corp. v. Distillers Co.*, 395 F.Supp. 221, 232–33 (S.D.N.Y. 1975); *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10, 537 N.Y.S.2d 787, 791, 534 N.E.2d 824, 828 (1988).

The doctrine is "intended to be sensitive to the realities and nuances of the bargaining process". *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d at 10, 537 N.Y.S.2d at 791, 534 N.E.2d at 828 (quoting *State v. Avco Financial Service of New York, Inc.*, 50 N.Y.2d at 389–90, 429 N.Y.S.2d at 185, 406 N.E.2d at 1078). It has little applicability in a commercial setting, and is intended primarily to protect the "commercially illiterate consumer beguiled into a grossly unfair bargain by a deceptive vendor or finance company." *Equitable Lumber Corp. v. IPA Land Development Corp.*, 38 N.Y.2d 516, 523, 381 N.Y.S.2d 459, 464, 344 N.E.2d 391, 396 (1976).

Unconscionability is a question of law. *American Telephone & Telegraph Co. v. New York City Dep't of Human Resources*, 833 F.Supp. 962, 988 (S.D.N.Y.1993); *Colonial Life Insurance v. Electronic Data Systems*, 817 F.Supp. 235, 241 (D.N.H.1993); *American Dredging Co. v. Plaza Petroleum Inc.*, 799 F.Supp. 1335, 1339 (E.D.N.Y.1992); *Damin Aviation Corp. v. Sikorsky Aircraft*, 705 F.Supp. 170, 177 (S.D.N.Y.) (applying Connecticut law), *aff'd without op.*, 880 F.2d 1318 (2d Cir.1989). It is extremely rare for a court to find an unconscionable limitation on consequential damages in a contract between experienced businessmen arising in a commercial setting. *See, e.g., Winter Panel Corp. v. Reichhold Chemicals, Inc.*, 823 F.Supp. at 973 (a damages limitation clause is not unconscionable because it is a reasonable allocation of risks between two commercial entities); *Colonial Life Insurance Co. v. Electronic Data Systems*, 817 F.Supp. at 241–42 (unconscionability is of "questionable applicability" where the transaction is financially significant and the buyer has negotiating power); *American Dredging Co. v. Plaza Petroleum Inc.*, 799 F.Supp. at 1339

("[T]here is a presumption of conscionability when the contract is between businessmen in a commercial setting".); *Damin Aviation Corp. v. Sikorsky Aircraft*, 705 F.Supp. at 177 (in commercial transactions, unconscionability is "rarely found".); *American Electric Power Co. v. Westinghouse Electric Corp.*, 418 F.Supp. 435, 458 n. 41 (S.D.N.Y.1976) ("Unconscionability rarely exists in a commercial setting involving parties of equal bargaining power".): *County Asphalt, Inc. v. Lewis Welding & Engineering Corp.*, 323 F.Supp. 1300, 1308 (S.D.N.Y.1970) ("[I]t is the exceptional commercial setting where a claim of unconscionability will be allowed".), *aff'd*, 444 F.2d 372 (2d Cir.), *cert. denied*, 404 U.S. 939, 92 S.Ct. 272, 30 L.Ed.2d 252 (1971).

In the present case, there is no reason to deviate from this general rule; the limitations on consequential, delay and labor-related damages are not unconscionable. Both parties were represented by businessmen. While the record does not disclose their experience, Northern never suggests that it was duped or overborne by LTV. In this regard, Northern had secured a near $9 million contract, and its dealings with LTV concerned a purchase of parts that were worth only about $22,000. If anyone enjoyed superior bargaining power, it was Northern. Further, Northern never says that it lacked "meaningful choice", and could not have obtained the bearing pads from another source.

Moreover, conspicuousness, while a factor, is not dispositive.[9] *American Dredging Co. v. Plaza Petroleum Inc.*, 799 F.Supp. at 1339; in any event, the disclaimer was not inconspicuous. The entire LTV Conditions consist of only one page, and appear on the reverse side of the Acknowledgment. The print, though relatively small, is the same size as most of the other print comprising the Conditions. Furthermore, despite its criticism that the limitations were not conspicuous, Northern never says that it did not see the Conditions or read them at the time it received the Acknowledgment.

9. Northern's reliance on UCC § 2–316 is misplaced. That section concerns disclaimers of warranties rather than limitations on damages.

The two are distinct and governed by different requirements. *American Dredging Co. v. Plaza Petroleum Inc.*, 799 F.Supp. at 1339.

Finally, the limitations represent a reasonable allocation of risks, and are not unfair. The entire Northern contract with NYSDOT was nearly $9 million, but the 140 Plain Bearing Pads cost only $3,617.60, or $25.04 each. It is logical that the risk should follow the reward. If such an allocation were unconscionable, minor suppliers on major construction projects would have to face risks utterly disproportionate to any financial interest or expectation of profit in the supply contract.

The conclusion that the damage limitations are not unconscionable still leaves one question remaining: if the repair, replacement or credit remedy ultimately fails of its essential purpose, must the damage limitation clauses also fall? In other words, are the damage and remedy limitations independent or interdependent?

The federal and state courts in New York view the limitations on remedies and damages as independent. Even if the former falls, the latter will still be enforced, at least where the seller has acted in good faith and the buyer retains a minimum adequate remedy such as damages. *American Electric Power Co. v. Westinghouse Electric Corp.,* 418 F.Supp. at 458–59; *Cayuga Harvester v. Allis–Chalmers Corp.,* 95 A.D.2d at 14–15, 465 N.Y.S.2d at 613–14: *see County Asphalt Inc. v. Lewis Welding & Engineering Corp.,* 323 F.Supp. at 1309.

If the limited remedy of repair replacement or credit failed in this case because of an implied condition that it be effected within a reasonable time, Northern would retain minimum adequate remedies under the contract. It might have been able to "cover" by purchasing the pads from another supplier, and recover certain "cover" damages under UCC § 2–712(2). Even by accepting the redesigned pads from LTV, it would retain the right to sue for ordinary contract damages as well as any incidental damages that were not specifically excluded under the LTV Conditions. We recognize that on the facts of this case, Northern may not have suffered ordinary contract damages because the Plain Bearing Pads that LTV ultimately delivered met the more rigorous requirements of Specification § 716.04, and may have had a greater market value than the pads that LTV initially agreed to deliver. But not suffering ordinary contract damages recoverable under UCC § 2–714 does not mean that Northern did not have that remedy if it had.

## CONCLUSION

LTV's motion for summary judgment is granted to the extent of expunging that portion of Northern's claim that consists of consequential, delay or labor-related damages. It is denied in all other respects. First, we cannot determine on the present record whether LTV breached its contract with Northern, and if it did, whether the limited remedy of repair, replacement or credit failed of its essential purpose. Second, if LTV breached the contract and the limited remedies failed, we cannot determine from the present record which portions of Northern's claim consist of ordinary contract damages, incidental damages that are not excluded, and those damages—consequential, delay and labor-related—that cannot be recovered.

The parties are directed to settle an order on notice which is consistent with this memorandum decision, and to appear for a pretrial conference on March 2, 1994, at 10:00 a.m.

IT IS SO ORDERED.