USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT

No. 97-2131

 JOM, INC., d/b/a CHIPCO INTERNATIONAL, LTD.,

 Plaintiff, Appellee,

 v.

 ADELL PLASTICS, INC.,

 Defendant, Appellant.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MAINE

 [Hon. David M. Cohen, U.S. Magistrate Judge]

 

 Before

 Torruella, Chief Judge, Selya, Boudin, Stahl,
 Lynch and Lipez, Circuit Judges,
 Coffin and Cyr, Senior Circuit Judges.

 

 John M.R. Paterson, with whom Mary Elizabeth Fougere and Bernstein,
Shur, Sawyer & Nelson were on brief for appellant.
 Catherine R. Connors, with whom Peter W. Culley, Geraldine G.
Sanchez and Pierce Atwood were on brief for appellee.

 

 October 4, 1999
 

 OPINION EN BANC

 
 Per Curiam. Adell Plastics, Inc. ("Adell") appealed from
a district court judgment awarding JOM, Inc., d/b/a Chipco
International, Ltd. ("Chipco"), $884,332 in compensatory damages
for breach of contract. The panel opinion affirmed the liability
ruling, but remanded to the district court for a recalculation of
damages in accordance with a contractual damages-limitation clause. 
Chipco's motion for rehearing en banc having been granted, we
vacate the panel opinion. Having concluded that oral argument is
unnecessary, we rely instead on the parties' written submissions.
We now reinstate that portion of the panel opinion affirming the
district court's liability ruling, but remand to the district court
for its determination as to whether the damages cap constituted a
"material alteration" excludable from the contracts of the parties.
 I
 BACKGROUND
 Chipco produces and sells casino gaming chips
manufactured from pelletized polyester resin. From 1986 to 1994,
Chipco acquired its resin exclusively from General Electric. In
September 1994, Chipco decided to purchase a less expensive resin
produced by Adell, which Adell represented to be equal or superior
in quality to the resin supplied by General Electric. The purchase
orders which Chipco forwarded to Adell contained no language
relating to warranties or remedies in the event of breach. In
contrast, the reverse side of the invoices Adell forwarded to
Chipco with each resin shipment listed numerous conditions of sale,
one of which ÄÄ the "damages-limitation clause" ("No claim of any
kind . . . shall be greater in amount than the purchase price of
the materials in respect of which damages are claimed.") ÄÄ is
central to the present appeal.
 After July 1995, Chipco bought all its resin from Adell. 
Before long, however, Chipco's casino customers began to complain
that the new gaming chips were less attractive and durable than
those produced with the General Electric resin. Consequently, in
accordance with its two-year unconditional product warranty Chipco
had to replace more than one million chips due to defects
attributable to their chemical composition. Since Adell was unable
to correct its defective resin, by February 1996 Chipco had
resorted to another resin supplier.
 Chipco brought suit against Adell in federal district
court, alleging breach of contract, breach of warranties,
negligence, and fraudulent or negligent misrepresentation. Chipco
demanded past and future damages for its chip-replacement costs and
lost profits. Adell counterclaimed for the balance due on its
account receivable against Chipco. The district court (Hornby, J.)
granted Adell partial summary judgment on the ground that the
damages-limitation clause in its invoices formed part of the sales
contract and established the resin purchase price as the cap on
damages recoverable by Chipco. The remaining issues were scheduled
for trial on June 24, 1997, before United States Magistrate Judge
Cohen ("trial judge").
 On the eve of trial, Adell filed several motions in
limine, seeking to exclude from evidence (i) proof relating to the
defective condition and replacement cost of thousands of gaming
chips which had been destroyed by Chipco during discovery and (ii)
various documents which Chipco had culled from its business records
for use in proving liability and damages, on the ground that Chipco
had failed to produce the more complete business records Adell had
requested during discovery. The trial judge denied both motions.
 In addition, consistent with the earlier grant of partial
summary judgment by Judge Hornby, Adell sought to exclude all
evidence of damages over and above the purchase price of the resin. 
The trial judge denied this motion in limine as well, on the ground
that our intervening decision in Ionics, Inc. v. Elmwood Sensors,
Inc., 110 F.3d 184 (1st Cir. 1997), effectively displaced Judge
Hornby's summary judgment ruling as the law of the case, thereby
precluding as a matter of law any consideration of the damages-
limitation clause in construing the sales contracts between Adell
and Chipco.
 After Chipco rested its case at trial, Adell successfully
moved for judgment as a matter of law on the negligence and
fraudulent misrepresentation counts, see Fed. R. Civ. P. 50(a)(1),
but elected not to renew its Rule 50 motion as to the remaining
counts following the close of the evidence. The jury returned a
special verdict totaling $961,658 on Chipco's breach of contract
and warranty claims, and for $77,336 on Adell's counterclaim. The
district court accordingly entered final judgment for Chipco in the
net amount of $884,322, from which Adell has appealed.
 II
 DISCUSSION
 A. Evidentiary Rulings Relating to Adell's Liability
 1. The Destroyed Chips
 At the outset Adell argues that it was error to admit
evidence that Chipco's casino customers had returned thousands of
chips manufactured with Adell resin, since Chipco conceded that it
had destroyed all but a small sampling of the returned chips prior
to trial, thereby depriving Adell of any opportunity to discover
independent proof that the destroyed chips had been manufactured
from General Electric resin, rather than Adell resin. Adell
further contends that Chipco continued to destroy the returned
chips even after Adell had made its discovery request that Chipco
turn over all returned chips to Adell.
 We review the denial of the motion in limine only for
abuse of discretion. See Gonzalez-Marin v. Equitable Assurance
Soc'y of the U.S., 845 F.2d 1140, 1147 (1st Cir. 1988); see also
Blinzler v. Marriott Int'l, Inc., 81 F.3d 1148, 1158 (1st Cir.
1996). The district court, in its discretion, may exclude related 
evidence by way of sanctioning a willful or negligent destruction
or alteration of physical evidence which causes unfair prejudice to
another party. See Sacramona v. Bridgestone/Firestone, Inc., 106
F.3d 444, 446 (1st Cir. 1997). We discern no abuse of discretion
by the trial judge.
 Unlike most types of physical evidence, casino chips are
a form of quasi-currency, which State gaming laws commonly require
the casino or chip manufacturer to destroy upon removal from
service. See, e.g., N.J. Admin. Code, tit. 19, ch. 46, 19:46-1.6
(Inventory, Security, Storage and Destruction of Gaming Chips). 
Yet early in the discovery process, after Chipco had informed Adell
of this ongoing chip destruction program, Adell inexplicably failed
to ask the district court to intervene. See Fed. R. Civ. P. 37;
R.W. Int'l Corp. v. Welch Foods, Inc., 937 F.2d 11, 18-19 (1st Cir.
1991) (noting that [Federal Civil] Rule 37 is a "case management
tool" which "sets forth a clear path to be followed if a party
believes that another litigant is not cooperating in the discovery
process," and that "defendants should have filed a motion to compel
production"). Instead, Adell lay in wait until the eve of trial
before filing its motion in limine.
 In these circumstances the district court fairly could
infer that Adell had bided its time in order to exploit the
incurability of the alleged discovery violation by Chipco, rather
than undertake its own chemical analysis of the resin content of
the sample chips proffered by Chipco at trial. Furthermore, Chipco
adduced trial testimony that its customers had never complained
about defective chips between 1986 and 1994 ÄÄ while Chipco was
using General Electric resin ÄÄ but only after Chipco began using
Adell resin. Adell cross-examined these witnesses at length.
 Finally, the trial judge instructed the jury that it
could draw an inference adverse to Chipco if it were to find that
Chipco had destroyed the chips for other than an "innocent reason." 
See Blinzler, 81 F.3d at 1159 (endorsing similar instruction). As
the destruction of chips did not unfairly prejudice Adell in these
circumstances, the denial of its motion in limine did not
constitute an abuse of discretion. See Gonzalez-Marin, 845 F.2d at
1147.
 2. The Business Records
 Adell next challenges the denial of its motion to exclude
from evidence the so-called "chip replacement binder" ("CRB")
maintained by Chipco. In November 1996, Adell sought to discover
any "customer file folders" containing customer complaints received
by Chipco relating to chips manufactured from Adell resin. Rather
than provide Adell with the entire contents of its customer files,
Chipco produced the documents it considered relevant to the claims
in litigation and compiled them in the CRB. These documents
included the original customer-order forms, the Chipco invoices,
and a "Job Production Cost Summary" detailing what it cost Chipco
to manufacture both the original and the replacement chips. Early
in 1997 Adell exhaustively deposed Chipco officials regarding the
contents of the CRB. In due course Chipco included the CRB on the
Joint Exhibit List.
 Once again on the eve of trial, Adell filed a motion in
limine urging for the first time that the CRB be excluded because
Chipco had not produced the customer files in their entirety. 
Since the chips returned by customers bore no distinctive markings
which would permit a visual determination as to whether they had
been manufactured from resin supplied by Adell or by General
Electric, Adell surmised that other documents in the customer files
might have enabled it to trace individual returned chips back to
Chipco's original customer invoices, and thereby establish that
particular chips had been manufactured at a time Chipco was using
only General Electric resin.
 The trial judge denied the motion on the ground that
Adell's objection should have been raised during discovery. We
agree. Whatever the breadth of its original document request, had
Adell truly been concerned that Chipco either misinterpreted or
willfully failed to comply with the discovery request, it should
have conferred in a timely manner with a view to obtaining
voluntary disclosure by Chipco, see Fed. R. Civ. P. 37(a)(2)(A)
(requiring certification of movant's good-faith consultation),
failing which it should have moved to compel production, see id.,
well in advance of trial. See DesRosiers v. Moran, 949 F.2d 15, 22
n.8 (1st Cir. 1991) (noting that "courts have often deemed
discovery violations to have been waived" where parties fail "to
bring the matter of non-production to the court's attention at the
pretrial hearing or in some other timely fashion"); Allen Pen Co.
v. Springfield Photo Mount Co., 653 F.2d 17, 23 (1st Cir. 1981)
(noting that party which deliberately passes up available discovery
remedies "cannot wait for trial and then seek close to a
declaration of victory on the issue"); Clinchfield R.R. Co. v.
Lynch, 700 F.2d 126, 132 (4th Cir. 1983) (same); see also Jackson
v. Harvard Univ., 900 F.2d 464, 469 (1st Cir. 1990) ("Preclusion
and negative inference are grave steps, 'by no means an automatic
response to a delayed disclosure . . . [or] where failure to make
discovery [is] not willful.'") (citation omitted).
 Moreover, it is important to note that Adell does not
suggest that it acquired any new information regarding the contents
of the CRB between April 1997 and the commencement of trial. 
Coupled with its procrastination after learning of the ongoing
destruction of returned chips, see supra Section II.A.1, its
failure to move to compel production of the complete customer file
folders until the eve of trial gave rise to a virtually inevitable
inference that Adell was not so much interested in obtaining the
customer folders to disprove its contract liability, as to hold in
abeyance a putative discovery violation with which to prevent
Chipco from introducing at trial the highly prejudicial evidence
contained in the CRB. For these reasons, we reject the contention
that the trial judge abused his discretion in treating Adell's
stratagem as yet another instance of unfair brinkmanship.
 B. Evidentiary Ruling Relating to Damages
 1. UCC Section 2-207(2)(c)
 Adell next challenges the denial of its motion in limine
to preclude evidence of contract damages over and above the resin
purchase price based on the damages-limitation clause cap. 
Although Judge Hornby had granted Adell partial summary judgment on
this issue earlier, the trial judge thereafter ruled that our
intervening decision in Ionics, 110 F.3d at 184, required a
different result. See Parilla-Burgos v. Hernandez-Rivera, 108 F.3d
445, 448 n.6 (1st Cir. 1997) (if governing law changes, court may
revisit law of the case).
 The instant claim turns on an interpretation of section
2-207 of the Uniform Commercial Code ("UCC"), whose drafters
intended to address "the sad fact that many [modern] sales
contracts are not fully bargained, not carefully drafted, and not
understandingly signed by both parties." 1 James J. White & Robert
S. Summers, Uniform Commercial Code 1-3, at 6 (4th ed. 1995)
[hereinafter: "White & Summers"]. Thus, contracting merchants
commonly exchange "canned" forms: typically, the prospective buyer
forwards a purchase order to a prospective seller after filling in
the quantity and price; then the seller delivers the goods to the
buyer, along with an invoice. It is not at all uncommon, of
course, for the purchase order and invoice to prescribe quite
different conditions of sale, normally as prompted by the perceived
self-interest of the proponent.
 Under the so-called "mirror image" rule which prevailed
at common law, an invoice from the seller containing terms
materially different from those in the buyer's offer would be
considered a mere counteroffer, rather than an acceptance of the
offer. Thus, no contract came into existence unless the buyer
subsequently accepted the counteroffer, either expressly or
impliedly (e.g., by accepting delivery of the goods). UCC 2-207
was designed to address the rigidity of the common-law rule by
severely restricting the circumstances in which the "mirror image"
rule would be allowed to defeat the formation of a contract of
sale:
 (1) A definite and seasonable expression of
 acceptance or a written confirmation
 which is sent within a reasonable time
 operates as an acceptance even though it
 states terms additional to or different
 from those offered or agreed upon, unless
 acceptance is expressly made conditional
 on assent to the additional or different
 terms. 

 (2) The additional terms are to be construed
 as proposals for addition to the
 contract. Between merchants such terms
 become part of the contract unless:

 (a) the offer expressly limits
 acceptance to the terms of the
 offer;

 (b) they materially alter it; or

 (c) notification of objection to them
 has already been given or is given
 within a reasonable time after
 notice of them is received.

 (3) Conduct by both parties which recognizes
 the existence of a contract is sufficient
 to establish a contract for sale although
 the writings of the parties do not
 otherwise establish a contract. In such
 case the terms of the particular contract
 consist of those terms on which the 
 writings of the parties agree, together
 with any supplementary terms incorporated
 under any other provisions of this Title.

UCC 2-207. 
 Section 2-207 thus affords three main avenues to contract
formation. See generally White & Summers 1-3, at 19-20. First,
if the parties exchange forms with divergent terms, yet the
seller's invoice does not state that its acceptance is made
"expressly conditional" on the buyer's assent to any additional or
different terms in the invoice, a contract is formed, and its
precise terms are determined through recourse to the three-part
test in 2-207(2).
 Second, if the seller does make its acceptance "expressly
conditional" on the buyer's assent to any additional or divergent
terms in the seller's invoice, the invoice is merely a
counteroffer, and a contract is formed only when the buyer
expresses its affirmative acceptance of the seller's counteroffer. 
Unlike the "mirror image" rule at common law, however, the seller's
invoice is not deemed "expressly conditional" under 2-207 merely
because its terms do not match the terms of the buyer's offer. 
Rather, to be deemed "expressly conditional," the seller's invoice
must place the buyer on unambiguous notice that the invoice is a
mere counteroffer. See id. at 20 (noting that "express
conditionality" is "not easily invoked").
 Finally, where for any reason the exchange of forms does
not result in contract formation (e.g., the buyer "expressly limits
acceptance to the terms of [its offer]" under 2-207(2)(a), or the
buyer does not accept the seller's counteroffer under the second
clause of 2-207(1)), a contract nonetheless is formed if their
subsequent conduct for instance, the seller ships and the buyer
accepts the goods demonstrates that the parties believed that
a binding agreement had been formed. The terms of their agreement
would then be determined under the "default" test in 2-207(3),
which implicitly incorporates the criteria prescribed in 2-
207(2).
 The present controversy implicates the very different
interpretation of 2-207 announced more than three decades ago in
Roto-Lith, Ltd. v. F.P. Bartlett & Co., 297 F.2d 497 (1st Cir.
1962). But see Ionics, 110 F.3d at 187 (overruling 2-207
interpretation announced in Roto-Lith). There, Roto-Lith sent
Bartlett a purchase order which did not mention warranties. 
Bartlett returned an invoice expressly excluding all warranties and
limiting Roto-Lith's remedies for breach of contract to the
replacement cost of any goods which differed materially from
specified samples. The Bartlett invoice further required that
Roto-Lith notify it "at once" in the event the additional
conditions in the invoice were unacceptable. Instead, Roto-Lith
accepted delivery of the goods and remained silent. When the goods
proved defective, Roto-Lith brought an action for breach of
contract against Bartlett. See id. at 498-99.
 At trial, Bartlett moved for directed verdict on the
ground that its invoice was an "acceptance . . . expressly made
conditional on assent to [its] additional or different terms," and
therefore constituted a mere counteroffer under the second clause
of 2-207(1), rather than an acceptance which formed a binding
contract. Bartlett argued that (i) a binding contract thereafter
was formed when Roto-Lith accepted delivery of the goods without
objecting to Bartlett's exclusion of warranties, (ii) all terms of
the invoice then became part of the sales contract by operation of
the common-law "mirror-image" rule, and (iii) therefore the
statutory criteria for determining the terms of the contract ÄÄ
i.e., subsections 2-207(2) and (3) ÄÄ were rendered inapposite. 
See id. at 499-500.
 Roto-Lith responded that notwithstanding the divergent
term in the Bartlett invoice excluding all warranties, the invoice
did not announce itself as a counteroffer; hence, the invoice
qualified as an "acceptance" within the meaning of the first clause
of 2-207(1), and a contract was formed. Further, Roto-Lith
argued, since the warranty exclusion in the Bartlett invoice
"materially altered" the terms of the Roto-Lith offer, 2-
207(2)(b) controlled and precluded the warranty exclusion from
becoming a contract term. Id.
 The district court accepted Bartlett's interpretation,
holding that the drafters did not intend that the UCC displace the
common law tests applicable to these everyday commercial
transactions. We affirmed. See id. at 500 (holding that "a
response [viz., an invoice] which states a condition materially
altering the obligation solely to the disadvantage of the offeror
is an 'acceptance . . . expressly conditional on assent to the
additional terms'"); see also Ionics, 110 F.3d at 185 (noting that
Roto-Lith abandoned subsections 2-207(2) and (3), and "reverted to
the common law").
 Thirty-five years later, Ionics displaced Roto-Lith. 
There, Ionics had sent Elmwood a purchase order expressly reserving
all "remedies provided by law or equity" and insisting that
"[a]cceptance by [Elmwood] of this order shall be upon the terms
and conditions set forth [herein] . . . [and] [n]o terms which are
in any manner additional to or different from those herein set
forth shall become a part of, alter or in any way control the terms
and conditions herein set forth." Id. Elmwood returned an invoice
which excluded all warranties not "expressly set forth herein,"
disclaimed any liability for consequential or incidental damages,
and limited Ionics's remedy for breach to a refund of the purchase
price upon return of the goods. Id. at 186. After Ionics accepted
delivery, the goods proved defective and Ionics sued Elmwood for
contract damages. Relying on Roto-Lith, Elmwood moved for partial
summary judgment, contending that the express exclusion of any
implied warranty of fitness contained in its invoice became part of
the contract which was formed when Ionics accepted Elmwood's
"counteroffer" by taking delivery of the goods without any
objection to its divergent terms.
 The district court denied the Elmwood motion for summary
judgment. Ionics, Inc. v. Elmwood Sensors, Inc., 896 F. Supp. 66
(D. Mass. 1995). It distinguished Roto-Lith on the ground that the
Roto-Lith purchase order had been silent in regard to warranties,
whereas the Ionics purchase order expressly reserved all implied
warranties "provided by law," thus directly contradicting and
precluding ab initio the subsequent proposal in the Elmwood invoice
to exclude all implied warranties. "If Roto-Lith applied in [both
types of] cases [viz., to objecting and "silent" buyers alike] . .
. , 2-207(3) would be preempted entirely" by the "mirror image"
rule. Id. at 69. The district court then certified its partial
summary judgment ruling for immediate appeal.
 In the ensuing appeal by Elmwood, we rejected the
attempts by Ionics and the district court to distinguish Roto-Lith
on its facts: "It would be artificial to enforce language [viz.,
the warranty disclaimer in the Roto-Lith invoices] that conflicts
with background legal rules while refusing to enforce language
[viz., the warranty disclaimer in the Ionics invoices] that
conflicts with the express terms of the contract." Ionics, 110
F.3d at 188 (emphasis added). From a policy standpoint, we
observed that such distinctions also would "lead parties to include
more of the background [legal] rules in their initial forms, making
forms longer and more complicated," which in turn would have the
perverse effect of discouraging the contracting parties from
reading the forms exchanged between them. Id.
 Finding no principled basis on which to distinguish the
circumstances in Ionics and Roto-Lith, we overruled Roto-Lith. See
id. at 189. Shifting our focus from the common-law "mirror image"
rule to the UCC, we noted that the Ionics-Elmwood transaction fit
squarely within the ambit of Comment 6 to 2-207:
 Where clauses on confirming forms sent by both 
 parties conflict[,] each party must be assumed
 to object to a clause of the other conflicting
 with one on the confirmation sent by himself. 
 As a result the requirement that there be
 notice of objection which is found in
 subsection (2)[(c)] is satisfied and the
 conflicting terms do not become a part of the
 contract. The contract then consists of the
 terms originally expressly agreed to, terms 
 on which the confirmations agree, and terms
 supplied by this Act, including subsection
 (2).

UCC 2-207 cmt. 6.
 We thus rejected the Roto-Lith "mirror image" rule that
the mere proposal of an additional or different material term by
the seller would make its invoice a counteroffer to the buyer's
purchase offer (i.e., an "acceptance . . . expressly made
conditional on [the buyer's] assent"), rather than an outright
acceptance of the buyer's purchase offer. Instead, the forwarding
of such an invoice gives rise to a binding contract and in the
event of a contract dispute the terms of the contract are
determined under the test set forth in 2-207(3), which in turn
implicitly incorporates the criteria in 2-207(2). Ionics, 110
F.3d at 189.
 Chipco urges as the trial judge held that Ionics
controls the present dispute even though the Chipco purchase orders
contained no express objection to a damages-limitation clause, on
the ground that our "background legal rules" discussion in Ionics
necessarily implied that all so-called UCC "gap-fillers" those
UCC provisions designed to supply necessary default terms where the
parties' contract is silent must be read into all "silent"
purchase orders, and thus serve as the buyer's "[prior]
notification of objection" under 2-207(2)(c). According to
Chipco, these gap-fillers include not only a reservation of the
implied warranties, see, e.g., UCC 2-314 (implied warranty of
merchantability) & 2-315 (implied warranty of fitness for a
particular purpose), which were at issue in Roto-Lith and Ionics,
but also the buyer's presumptive right to recover in full measure
all contract damages attributable to the seller's breach, see id.
 2-714 (damages for breach) & 2-715 (recovery of incidental and
consequential damages). We conclude that the reading given our
"background legal rules" discussion by the trial judge is more
expansive than its context warranted.
 The "background legal rules" discussion in Ionics
addressed Ionics' attempt to hypothesize a factual distinction
between its case and Roto-Lith. Assuming arguendo that the Roto-
Lith rule were to remain intact as controlling circuit precedent,
we posed the very narrow question whether it would make sense to
establish an exception to Roto-Lith's "mirror image" rule where the
buyer expressly excludes ab initio, in its purchase order, the
seller's additional terms, while withholding that same protection
to a buyer like Roto-Lith which reasonably may have presumed
that the court would use the UCC as its baseline guide for
determining the buyer's contract expectations. For the policy
reasons already noted, see supra, we were persuaded that engrafting
a common-law exception (i.e., when the purchase order expressly
forecloses the seller from proposing particular divergent terms)
onto the common-law rule announced in Roto-Lith was not warranted.
 In fashioning common-law rules like the broad common-
law exception to 2-207 carved out in Roto-Lith courts almost
invariably weigh public policy considerations, often on their own
motion if need be. See, e.g., Claypool v. Levin, 562 N.W.2d 584,
588 (Wis. 1997). It is hardly surprising, therefore, that our
opinion in Ionics discussed the policies which would be fostered
were we to refine and perpetuate the common-law rule established in
Roto-Lith. On the other hand, when called upon to interpret a
statute, we are constrained in the first instance by the
policymaking prerogatives of the legislative and executive branches
as expressed or implied in the statute itself. See, e.g., Harrison
v. Montgomery County Bd. of Educ., 456 A.2d 894, 903 (Md. 1983)
(noting that "declaration of the public policy of [the State] is
normally the function of the General Assembly," which is fully
empowered to abrogate common-law rules).
 Once we determined that Roto-Lith and Ionics could not be
distinguished in a principled manner, however, the "background
legal rules" discussion in Ionics went by the wayside with the
common-law hypothetical from which it emerged, which explains why
the phrase is never again mentioned in the Ionics decision.
Instead, after concluding that routine recourse to common-law rules
is not required by the second clause of UCC 2-207(1), we turned
to the more constringent task of statutory interpretation. 
Presented with a clean statutory slate, we announced the narrow
holding that the UCC expressly protects a buyer, like Ionics, whose
purchase order expressly forewarns the seller of particular
contract terms which the buyer would find objectionable pursuant
to the "[prior] notification of objection" clause in 2-207(2)(c). 
Ionics, 110 F.3d at 189. Indeed, given the emphatic language in
its purchase order, it is likely that Ionics was entitled to the
protection of 2-207(2)(a) as well.
 Further conclusions of law were not required. It was
Elmwood which had sought partial summary judgment based on the per
se rule announced in Roto-Lith that all new terms in a seller's
"counteroffer" automatically become contract terms where the buyer
remains silent and renders performance under the contract. Once
the common-law rule in Roto-Lith became defunct, it necessarily
followed that Elmwood was not entitled to judgment as a matter of
law under Rule 56, and its appeal failed. Since Ionics was not a
"silent" buyer of the Roto-Lith type, nor had it moved for summary
judgment, we were not required to consider whether a "silent"
buyer, such as Roth-Lith or Chipco, also would be protected by 2-
207(2)(c) or by any other provision in section 2-207. In other
words, Ionics simply announced that both types of buyers were
relieved from the per se common-law rule of inclusion laid down in
Roto-Lith, and not that a Roto-Lith-type "silent" buyer may invoke
 2-207(2)(c). As Chipco is a "silent" buyer, however, we now
address that unresolved issue.
 After rejecting the Roto-Lith common-law "mirror image"
rule of offer and counteroffer, we noted in Ionics that the
transaction between Ionics and Elmwood came within the literal
language of Official Comment 6 to 2-207, which excludes from the
contract a new term proposed by a seller where "clauses on
confirming forms sent by both parties conflict." (Emphasis added.)
Of course, where the buyer's purchase order includes no term
relating to the subject matter dealt with in the new term proposed
by the seller (i.e., the purchase order is "silent"), it literally
cannot contain a "clause" with which the seller's invoice could
conflict.
 Whatever its policy implications, the rationale
underlying this distinction is readily discernible. The buyer
which explicitly includes a particular term in its purchase order
 even a UCC gap-filler presumably demonstrates that it has
considered the allocation of business risks associated with the
term, and, for example, has determined that it is unwilling to
accept greater risk. Thus, as is the case with "restricted offers"
under 2-207(2)(a), it is appropriate to treat the buyer's
explicit prior objection as a term which is "material," per se, to
the formation of any contract.
 On the other hand, although the "silent" buyer may be
signaling its implicit preference for the UCC's gap-filler terms,
its silence alone provides no reliable basis for a per se rule of
exclusion since it leaves open the key question whether the buyer
regarded any particular gap-filler term as especially "material" in
the circumstances of the transaction at hand. For instance, its
purchase order may have omitted a clause precluding any damages-
limitation clause, not because the buyer meant to insist that no
such term be precluded, but rather, for example, because the
parties' course of performance or course of dealing, or the
relevant trade usage, establishes that a damages-limitation clause
is presumptively included as an implicit term in the contract. See
White & Summers 1-3, at 18 (noting that the 2-207(2)(b)
"materiality" test may turn, inter alia, on course of dealing or
performance, or trade usage); UCC 1-205 ("Course of Dealing and
Usage of Trade"); 2-208 ("Course of Performance or Practical
Construction"). In such a setting, the buyer's silence may simply
reflect that it considers a damages-limitation clause "immaterial"
to contract formation. See, e.g., Dale R. Horning Co. v. Falconer
Glass Indus., 730 F. Supp. 962, 966 (S.D. Ind. 1990); see also The 
Berquist Co. v. Sunroc Corp., 777 F. Supp. 1236, 1246 (E.D. Pa.
1991).
 The context of UCC 2-207 conclusively confirms that its
drafters intended to accord distinctive treatment to sales
transactions involving "silent" buyers. Official Comments 4 and 5
set forth examples of the additional or different terms which may
give rise to "material" and "immaterial" alterations under 2-
207(2)(b). Comment 5 lists, as an example of an "immaterial"
alteration, "a clause . . . otherwise limiting remedy in a
reasonable manner (see Sections 2-718 and 2-719)." Section 2-719
envisions that contracting parties may agree to limit recoverable
damages otherwise available under 2-714 and 2-715. Thus, if
Chipco's interpretation of Ionics were correct, and all UCC gap-
fillers (like 2-714 and 2-715) were to be read into every
"silent" purchase order, then damages-limitation clauses invariably
would be excluded from the contract under 2-207(2)(c), whether or
not the purchase order expressly objected to such a limitation
clause, and the "materiality" inquiry at the very core of UCC 2-
207(2)(b) and Comment 5 would become wholly superfluous. See,
e.g., Costos v. Coconut Island Corp., 137 F.3d 46, 49 (1st Cir.
1998) ("'Nothing in a statute may be treated as surplusage if a
reasonable construction supplying meaning and force is otherwise
possible.'") (citation omitted). Thus, under the only harmonious
interpretation available in the present context, these UCC
provisions require that the "silent" buyer establish that it would
have rejected a damages-limitation clause as a "material
alteration," within the meaning of 2-207(2)(b), given all the
circumstances surrounding the transaction. See supra note 7; infra
Section II.B.2.
 Nevertheless, Chipco has not cited and we cannot find
 any case which endorses its reading of 2-207(2)(c) and Ionics. 
Rather, the courts which have interpreted 2-207(2)(c) do not read
UCC gap-fillers into purchase orders as a matter of law, but insist
that a merchant-buyer prove, for example, that a given invoice term
worked a "material alteration" to the contract. See, e.g., LTV
Energy Prods. Co. v. Northern States Contracting Co. (In re
Chateaugay Corp.), 162 B.R. 949, 952, 957-58 (Bankr. S.D.N.Y. 1994)
(summarizing extant case law supporting proposition that, where
"[buyer's] Purchase order . . . did not contain any general terms
or conditions of sale," and "where UCC 2-207(2)(a) and (2)(c)
[thus] do not apply," the non-assenting party must prove, inter
alia, that the seller's clause limiting the buyer's remedy to
repair and replacement of the goods was a "material alteration")
(emphasis added). 
 In summary, Ionics does not support the proposition that
a "silent" buyer is presumed to have objected in advance to any
seller-term that conflicts with a UCC gap-filler provision. 
Instead, Ionics merely relieved the buyer of the burden imposed by
the automatic rule announced in Roto-Lith, which, by removing the
case entirely from UCC 2-207 and relying on the common law,
precluded a buyer who had performed under the contract from
demonstrating at trial that the adverse seller-term at issue did
not become part of the contract. But if the "silent" buyer's
purchase order neither "expressly limits acceptance to the terms of
the offer" under 2-207(2)(a), nor necessarily constitutes
"[prior] [n]otification of objection to [any new terms added by the
seller]" under 2-207(2)(c), the buyer must look to some other UCC
provision to exclude the new seller-term.
 As Ionics is inapposite, and Adell's damages-limitation
clause is not excludable under 2-207(2)(c), Chipco could prevail
only if the damages-limitation clause (i) effected a "material
alteration" to the contract, see UCC 2-207(2)(b), (ii) was
"unconscionable," id. 2-719(3), or (iii) failed of its essential
purpose, id. 2-719(2). See LTV Energy Prods., 162 B.R. at 957-
58.
 2. UCC Section 2-207(2)(b): Materiality
 Where, as here, both contracting parties are merchants
(viz., non-"consumers"), see UCC 2-104(1) (defining "merchant"),
UCC 2-207(2) provides that any additional or different terms
proposed by the seller become part of the sales contract "unless"
the party which opposes the presumption of inclusion ÄÄ here,
Chipco ÄÄ can show that at least one of the three preconditions
specified in 2-207(2) was met. See, e.g., Avedon Eng'g, Inc. v.
Seatex, 126 F.3d 1279, 1284 (10th Cir. 1997); Comark Merch'g, Inc.
v. Highland Group, Inc., 932 F.2d 1196, 1201-02 (7th Cir. 1991);
Dale R. Horning, 730 F. Supp. at 966 n.2; LTV Energy Prods., 162
B.R. at 956.
 Section 2-207(2)(b) allows the buyer to show that a
damages-limitation clause proposed by the seller did not become
part of the contract, even though not objected to by the buyer,
because its inclusion would work a "material alteration." Although
the UCC does not define "material alteration," Official Comments 4
& 5 advise that a new term proposed by the seller is a "material
alteration" where it would "result in [unreasonable] surprise or
hardship [to the buyer] if incorporated without [the buyer's]
express awareness." UCC 2-207 cmt. 4 (emphasis added). Of
course, Comments 4 and 5 are illustrative only and the UCC provides
no further elucidation of the terms "surprise" or "hardship."
 III
 CONCLUSION
 The panel opinion concluded that Chipco, in the summary
judgment proceedings before Judge Hornby, had not preserved the
issue as to whether the damages-limitation clause constituted a
"material alteration," hence that Chipco was not entitled to a new
trial. As the en banc court, excepting two members of the original
panel, has determined that the highly idiosyncratic circumstances
and travel of this case so warrant, a remand for further
proceedings shall be ordered to permit Chipco an opportunity to
establish that the contractual damages cap worked a "material
alteration." As this "material alteration" question was never
briefed or argued, either below or on appeal, we leave its
consideration to the district court in the first instance. 
 The judgment of liability in favor of Chipco is affirmed;
the case is remanded for further proceedings in accordance with
this opinion. The parties shall bear their own costs. SO ORDERED.